STATE of Tennessee, Appellee,

v.

**Roger D. OODY, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

May 30, 1991.

Permission to Appeal Denied by Supreme Court Nov. 12, 1991.

Sharon G. Lee, Madisonville, Carroll L. Ross, Athens, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Michaela K. Mathews, Asst. Atty. Gen., Nashville, Jerry N. Estes, Dist. Atty. Gen., Athens, for the State.

OPINION

WADE, Judge.

The defendant, Roger D. Oody, appeals as of right his conviction for first degree murder. Although the state sought the death penalty, a term of life imprisonment was ordered. The term is consecutive to the sentences the defendant is serving for prior convictions.

In addition to his challenge to the sufficiency of the evidence, the defendant presents 11 issues for our review:

(1) whether the trial court should have granted defense counsel's motion to withdraw due to a conflict of interest;

(2) whether the trial court should have granted the defendant's motion for permission to employ the services of various experts;

(3) whether the court should have found the defendant incompetent to stand trial;

(4) whether a knife believed to be the murder weapon was illegally seized;

(5) whether the trial court should have granted individual and sequestered *voir dire* and full questioning of what the prospective jurors had read about the offense;

(6) whether the trial court committed error by stating, in the presence of a partial jury, that defense counsel asked "silly questions" during *voir dire;*

(7) whether blood donor information and a blood donor card were properly introduced into evidence;

(8) whether the trial court should have excluded the testimony of a witness not named on the state's witness list;

(9) whether the trial court properly admitted opinion evidence that the victim's wounds were defensive;

(10) whether an ax, not necessarily connected to the ax wounds of the victim, was improperly displayed to the jury; and

(11) whether the trial court should have instructed the jury not to consider the ax or the ax wounds absent any connection between the two.

We find no reversible error and affirm the judgment of the trial court.

The victim, Roy Stephens, was last seen by his sister, with whom he lived, at approximately 10:00 P.M. October 3, 1987. Just after midnight, Officer John Mills of the Loudon Police Department saw the defendant and two other men parked in a lighted, no parking zone at a boat ramp. When the defendant got out of his car, the officer saw that his clothing was spotted with blood. The defendant explained that he had been killing chickens. Although he had been drinking, the defendant passed a field sobriety test. As Officer Mills directed the two other men to get out of the car, he saw a straight blade knife in the floorboard of the back seat. When Officer Mills noted that the blade was covered with blood, he checked to see if any crimes had been reported. When he found that none had, the men were released. Officer Mills told the defendant and the two men with him that they could come to the police department the next day to see about recovering the knife.

On the following Thanksgiving Day, a hunter found the victim's decayed remains in the woods. The ensuing investigation by the TBI ultimately led to Tommy Lawson who testified for the state.

Lawson, granted immunity against prosecution, related that he, Ronald Davis, and the defendant picked up the victim at his residence on the evening of October 3, 1987. A while later, the defendant held a knife on the victim, yelled at him for beating the defendant's mother, and struck him. The defendant directed Ronald Davis, who was driving, to stop the vehicle. Once out of the car, the defendant ordered the victim to lie on the street. While the victim pled for his life, the defendant stabbed him in the back repeatedly. He left the body on the shoulder of the road. The three men then drove to Loudon where they were questioned by the Loudon police officer. Afterwards, they returned to the scene to hide the body.

Lawson's statement prompted the TBI to locate the knife seized by the Loudon Police. The defendant's palm print was found on the handle. Expert testimony established that the blood type on the blade was

the same as the victim's. Dr. William Bass, a forensic anthropologist, testified that the victim had both knife and ax wounds and that, although the specific cause of death could not be determined, either could have been fatal.

Although Lawson's testimony regarding the murder was consistent at trial, he admitted on cross-examination that he had previously lied both in his initial statement to the investigating officers and in a prior evidentiary hearing. Lawson was on probation at the time of his testimony; he denied that fact at trial. The district attorney corrected that assertion as well as Lawson's testimony that he had not been offered immunity. On cross-examination, Lawson conceded that his version of the offense had changed considerably over the period of time between the commission of the crime and trial.

■ We first consider whether the trial court should have granted the defendant's motion for acquittal and whether the evidence was sufficient to support a first degree murder verdict. The trial judge expressed particular concern about the level of proof on the issue of "premeditation."

■ On appeal, the state is entitled to the strongest legitimate view of the evidence, and all reasonable and legitimate inferences which may be drawn from the proof. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). In a criminal action, a conviction will be set aside only where the reviewing court finds that the "evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e). In a jury trial, a guilty verdict, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in testimony in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978).

■ The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the testimony, however, are matters entrusted exclusively to the jury as the triers of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.

1978). The jury, which acquitted the defendant of robbery, chose to accredit the testimony of the prosecution witnesses on the murder charge. That is so despite the fragile evidence provided by the state's eyewitness. Other evidence, however, corroborated the testimony. Repeated blows may be used to establish the element of premeditation. *Houston v. State*, 593 S.W.2d 267, 273 (Tenn.1980). The evidence fully supports their verdict. We conclude that any rational trier of fact could have found the essential elements of the crime of murder beyond a reasonable doubt. The evidence of defendant's guilt satisfies the standard prescribed in Tennessee Rules of Appellate Procedure 13(e) and *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2782, 61 L.Ed.2d 560 (1979).

## I

■ The defendant initially contends that the trial court should have permitted Sharon Lee to withdraw when she discovered that the defendant may have stolen a vehicle from her father several years earlier. No one was prosecuted for that offense. We find no proof in the record on the issue. Certainly none is referenced in the briefs. *See* Tenn.R.App.P. 27(g).

■ An actual conflict, rather than the mere possibility, must be established prior to any removal or withdrawal of counsel. In order to demonstrate a violation of the defendant's sixth amendment right to conflict free counsel, the conflict must adversely affect the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 1717–19, 64 L.Ed.2d 333 (1980).

The brief filed on behalf of the defendant concedes that no prejudice resulted. Because counsel's performance was apparently unaffected by the earlier incident, we find no error.

## II

The defendant asserts that the trial court should have authorized his counsel to hire an investigator, a psychiatrist, a psychologist, a fingerprint analyst, and a serologist to assist in the trial preparation. He cites

as authority Tenn.Code Ann. § 40–14–207(b) which gives discretion to the trial court to authorize the indigent defendant any expert services "necessary to ensure that the constitutional rights of the defendant are properly protected." The statute provides that the trial court may consider the defendant's request in an *ex parte* hearing.

▮▮▮▮ This record, however, does not establish whether any *ex parte* hearing took place. The defendant fails to refer to any order denying his request for expert assistance. It is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what transcribed in the trial court with respect to the issues which form the basis of the appeal. Tenn.R.App.P. 24(b); *State v. Miller,* 737 S.W.2d 556, 558 (Tenn.Crim.App. 1987). In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence. *Vermilye v. State,* 584 S.W.2d 226, 230 (Tenn.Crim.App. 1979). The defendant has not, therefore, established that the requested services were necessary to ensure the adequate protection of his rights.

Furthermore, the defendant's strongest assertions relate to authorization for the employment of both psychological and psychiatric assistance. The record indicates that on at least two occasions the trial court ordered mental evaluations of the defendant at state expense.

▮▮▮▮ In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court held that when a defendant demonstrates that his sanity at the time of the offense is an issue, the state must, at a minimum, assure him access to a competent psychiatrist who will conduct an appropriate examination and assist in the presentation of the defense. That does not, however, include the selection of a psychiatrist of his choosing. *Id.* at 83, 105 S.Ct. at 1096. Here, the defendant's family was able to provide the indigent defendant with an evaluation by a psychologist. That psychologist testified that the defendant was not competent to

stand trial. Although the trial court accredited other expert testimony, the defendant was not at a disadvantage.

The record does not support the defendant's claim of error. In any event, we find no indication of any resultant prejudice to the defendant by the failure of the court to authorize the employment of other experts.

### III

▮▮▮▮ The defendant claims that the trial court erred by finding that he was competent to stand trial. He claims that he was not capable of consulting with his counsel or understanding the nature and object of the proceeding against him.

The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence. *United States v. Shepard,* 538 F.2d 107, 110 (6th Cir.1976). The findings of the trial court are conclusive on appeal unless the evidence preponderates otherwise. *Graves v. State,* 512 S.W.2d 603 (Tenn.Crim.App. 1973). In *Mackey v. State,* 537 S.W.2d 704 (Tenn.Crim.App.1975), former Presiding Judge Mark Walker enunciated the standard for evaluating the mental competency of a criminal defendant:

> Both Tennessee decisions and the federal constitution prohibit the trial of a defendant whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense. *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)....

*Id.* at 707.

Doctor Leonard Miller, a clinical psychologist, testified for the defendant. After conducting two evaluations two months apart, Doctor Miller testified that the defendant was of borderline mental retardation and a psychotic nature and, while manipulative, not a malingerer. He concluded that because the defendant was lucid for only minutes at a time, he would be unable

to assist his counsel. The defendant's aunt, mother, and brother stated that the defendant had had these problems since birth.

Doctor Samuel Craddock, a clinical psychologist with the DeBerry Correctional Facility, examined the defendant in July of 1988 and January and February of 1989. Although Dr. Craddock described the defendant as anti-social with a sub-average intelligence, Dr. Craddock found the defendant to be a malingerer and competent to stand trial. Dr. John Cain, a psychiatrist, also testified that the defendant was a malingerer who had exaggerated his disabilities. They observed that what the defendant "did on the residential unit was appreciably higher than what he was willing to do when we sat down for interviews...."

The officers who transported the defendant to his appointments stated that the defendant was able to communicate during the trips. One of the officers stated, however, that when later questioned by the mental health professionals, "he would go off into left field." He observed that "his demeanor with the doctor was altogether different ... than it was with me on the way up there."

The trial judge placed a great deal of reliance upon his own observations of the defendant during the course of the competency hearing. The court made particular note not only of the officers' testimony but also the degree of attention the defendant gave to one of the officers who testified during the proceeding.

We cannot find, by our review of the record, that the evidence preponderated against the findings made by the trial court.

## IV

■ The defendant asserts that the search for and seizure of the knife taken from the defendant by the Loudon City Police Department hours after the disappearance of the victim was illegal. The state argues that the defendant had no legitimate expectation of privacy because the vehicle was registered to a David Neagle. This issue was not considered by the trial court. Because standing was not previously contested by the state, the issue has been waived. It cannot be raised for the first time on appeal. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). We have nonetheless considered the merits of the claim.

■ One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn.1982). Our court has recognized that one may have such a legitimate expectation of privacy even if the property belonged to another. *State v. Turnbill*, 640 S.W.2d 40, 45 (Tenn.Crim. App.1982); *see Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In *United States v. Haydel*, 649 F.2d 1152 (5th Cir.1981), the United States Court of Appeals listed seven factors applicable to the standing inquiry:

(1) property ownership;
(2) whether the defendant has a possessory interest in the thing seized;
(3) whether the defendant has a possessory interest in the place searched;
(4) whether he has a right to exclude others from that place;
(5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion;
(6) whether he took normal precautions to maintain his privacy; and
(7) whether he was legitimately on the premises.

*Id.* at 1154–55.

By the application of these standards, we find that the defendant did, in fact, have a legitimate expectation of privacy and, therefore, standing to challenge the search.

■ The defendant claims that he was out of the car and that the officer who found the weapon didn't see the blood on the blade until he had removed it from the defendant's vehicle. The defendant specifi-

cally argues that the seizure was improper under the guidelines established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

We note that the straight-bladed knife, described as three inches long, was not violative of the provisions of Tenn.Code Ann. § 39–6–1703(a) pertaining to pocket knifes. Nor did the officer determine that the defendant had carried the knife "with the intent to go armed," in violation of Tenn.Code Ann. § 39–6–1701. The officer's radio inquiries did not suggest the defendant's involvement in any criminal activity. The officer did, however, know the defendant from prior burglary charges. Before leaving, the officer told the defendant that if he wanted the knife back, he would have to go by the police department to see the chief of police or the city judge. The defendant, of course, never did so.

In *Terry*, the United States Supreme Court approved the concept of the investigative stop based upon reasonable suspicion supported by specific and articulable facts. The sole justification of the intrusion was "the protection of the police officer and others nearby, and it must ... be confined in scope ... reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. at 1884. An officer, when in reasonable fear of his or others safety, has authority to conduct "a carefully limited search ... in an attempt to discover weapons which might be used to assault him." *Id.* at 30, 88 S.Ct. at 1885.

In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), *Terry* was broadened to allow an officer to order the suspect from a car after a lawful detention. Our state has authorized the investigatory stops of vehicles. *State v. Foote*, 631 S.W.2d 470 (Tenn.Crim.App. 1982); *State v. Yarbro*, 618 S.W.2d 521 (Tenn.Crim.App.1981). The detention, in these instances, must be brief absent the discovery of any offense within the scope of the limited search.

The defendant was parked at a TVA boat ramp behind a chair factory shortly after midnight. The area was illuminated by a street light. Officer Mills, who recognized the defendant as having been charged with a series of burglaries some three or four weeks earlier, asked him to step out of the car. The defendant explained that the men were waiting for a junkyard to open. The officer called for a backup officer, smelled alcohol on the defendant and subjected him, as the driver of the vehicle, to a field sobriety test. The fact that the defendant was able to pass the field test and did not appear to be intoxicated did not render the detention unlawful. *Yarbro*, 618 S.W.2d at 523. When Officer Mills saw spots of blood on the defendant's clothing, he asked the car's two passengers to step outside so as to be sure they were not carrying weapons. The trial court found from the proof on the defendant's motion to suppress that the officer did so out of a reasonable fear for his own safety. By then the backup officer was watching the defendant. As the passengers (one in the front and one in the back on the passenger's side) got out, Officer Mills opened the driver's door to watch their exit. With the aid of the car's interior light, he saw the knife lying on the backseat floorboard behind the driver's seat. The officer then seized the knife and saw blood on the blade. The defendant explained that he had been using it to kill chickens. Upon investigation, Officer Mills found that no crimes had been reported. The defendant was released and escorted by a third officer out of the county.

■■■ We conclude from these facts that there was a reasonable and articulable suspicion for the initial stop. In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court held, under circumstances similar to these, that an officer could lawfully order the driver from the car as a precautionary measure.[1] Thereafter, if the officer may rea-

1. Several years ago, a study indicated that thirty percent of all shootings of police officers occurred as they approached suspects seated in automobiles. *Adams*, 407 U.S. at 148, 92 S.Ct. at 1924 n. 3.

sonably conclude the suspect may be armed, a limited search may ensue. The issue, we think, is whether the officer's authority under *Terry* permitted a search of the interior of the vehicle:

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of a police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court described the permissible extent of the intrusion:

> The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable.... So long as the officer is entitled ... to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.

*Id.* at 146, 92 S.Ct. at 1923.

In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the United Supreme Court stated as follows:

> A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.

*Id.* 443 U.S. at 50, 99 S.Ct. at 2640.

Using these guidelines on this unusually close question of law, we conclude that the actions of the officer were, in fact, reasonable, precautionary measures incident to a legitimate stop and frisk. Officer Mills, standing near the defendant on the driver's side of the vehicle, was certainly within his authority by asking the two other men to get out of the vehicle. In order to assure that they were not armed, he opened the driver's door as the men got out on the passenger side. The knife was plainly in view as it lay on the driver's side of the backseat floorboard. Once the weapon was discovered, the officer could reasonably be expected to take it into his possession for examination. Nothing took place before the officer's discovery of the knife to repudiate the officer's reasonable suspicions to take care for his own safety. *See Hughes v. State,* 588 S.W.2d 296, 299 (Tenn.1979).

The plain view doctrine cuts across the various legitimate bases for warrantless searches and seizures. If the police had a prior justification, unrelated to any desire to search, for the intrusion, there may be a warrantless seizure. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *see Armour v. Totty,* 486 S.W.2d 537 (Tenn.1972). In this instance, we think the officer had a legitimate reason for opening the door, only as a safety measure, to watch the other two occupants make their exit. Because he was lawfully there, he was entitled to make the seizure. 3 W. LaFave, *Search and Seizure* § 7.5(a) (1987).

In conclusion, we think that the knife, the officer's observations of the knife, and the testimony of the fingerprint analyst were properly placed into evidence. Yet our holding is limited to these specific facts and should not be read to extend authorization to search a vehicle after a valid *Terry* stop. It is apparent here, we think, that the means by which the officer discovered the knife was not pretextual. Officer Mills' motivation to protect himself was well-founded. The intrusion was limited within the meaning of *Terry* and reasonable under these specific circumstances.

■ Whether the seizure, as opposed to the search, was reasonable depends upon all of the attendant circumstances, a balance of the intrusion of the constitutional rights of the individual against the "promotion of legitimate governmental interests." *See United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). We think the holding in the recent case of *State v. Harmon,* 775

S.W.2d 583 (Tenn.1989) *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1043 (1990), controls on the issue of seizure. There, a temporary seizure of property as a result of a valid *Terry* stop and frisk was upheld based upon the officer's reasonable suspicion that the items "contained contraband or evidence of crimes." *Id.* at 586. Subsequently, officers learned the property had been stolen. We are unable to make a distinction between that ruling in *Harmon* and the circumstances here. *See United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). We would also note that even if the seizure were unlawful, the search would have permitted both Officer Mills and his backup to have testified about the blood on the defendant's clothing, his possession of the knife, and the blood on its blade. In the context of the trial testimony, any error may have been harmless beyond a reasonable doubt.

## V

The defendant complains that the trial court should have granted individual rather than collective *voir dire*. Specifically, the defendant asserts that four of the original panel of 12 responded affirmatively when asked if they had heard about the case or read about it in the newspaper.

Generally, the control of *voir dire* rests within the sound discretion of the trial judge. *State v. Jefferson*, 529 S.W.2d 674, 682 (Tenn.1975). The prevailing practice in this state is to examine the jurors collectively rather than individually. *Bouchard v. State*, 554 S.W.2d 654, 659 (Tenn.Crim.App.1977). Individual *voir dire* is mandated, however, when there is a significant possibility that a prospective juror has been exposed to potentially prejudicial material. *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975); *State v. Claybrook*, 736 S.W.2d 95 (Tenn.1987). Rule 24(a) of the Tennessee Rules of Criminal Procedure provides for the parties to question prospective jurors "for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges"; it is stated that the court *may* direct that the questioning of prospective jurors be conducted out of the presence of the other members of the panel.

The issue here, we think, is more factual rather than legal. The better practice, of course, is to permit individual *voir dire* in a highly publicized case. The question in this case, however, is whether there was a "significant possibility" that any prospective jurors had been exposed to potentially prejudicial material.

The trial court, after learning that some of the prospective jurors had heard of the case, asked whether, as a result, the jurors had formed an opinion as to the guilt or innocence of the defendant. During the questioning by the court and counsel, nothing was said, in our view, which prejudiced the defendant. The few jurors who knew anything at all answered that they recalled very little, if any, of what they had heard or read. The manner used here is very similar to that approved by our Supreme Court in the case of *State v. Porterfield*, 746 S.W.2d 441, 447 (Tenn.1988).

The only juror who indicated any real knowledge of the case stated that she recalled that a man was missing and later found. That prospective juror was later removed from the panel. The other information related by prospective jurors who knew in some way of the case was insignificant. A juror who stated that she was not sure whether she could be fair based upon what she had heard was removed for cause.

Most importantly, none of the newspaper articles or media reports were entered into the record of this case. There is nothing to suggest that they contained material which was exposed to the jurors or was prejudicial to the defendant. *See State v. Prince*, 713 S.W.2d 914, 917 (Tenn.Crim.App.1986).

In conclusion, we find no abuse of discretion by the trial court. None of the jurors appears to have known of the "jury verdict at a prior trial, or ... been exposed to other potentially prejudicial material." *Sommerville*, 521 S.W.2d at 797.

## VI

Nine of the twelve jurors had been chosen when the following exchange took place:

**Defense Counsel:** You feel like that I as his attorney would have to prove his innocence to you?

**Prospective Juror:** Yeah.

**Counsel:** Your Honor, based upon that response, I would most respectfully ...

**The Court:** I'm not sure what the response was.

**Counsel:** That the defendant would have to prove his innocence. I asked it ...

**The Court:** You all ask such silly questions. I mean you ask them "If you had to vote right now," and well, nobody has to vote right now.

The incident took place during the second day of *voir dire*. While a lengthy *voir dire* does not excuse an inappropriate comment by the trial judge, there are other factors to be considered here. The comment was directed to all counsel. Previously, the same prospective juror stated that he understood the presumption of innocence and would require the state to prove their case beyond a reasonable doubt. Several hypothetical questions were posed by defense counsel. In attempting to clarify the juror's duty, the trial court complimented counsel:

I liked her example she gave these other jurors earlier about the chocolate cake. You weren't here then, but if you're going to make a chocolate cake and you use eggs and sugar and whatever else you use and chocolate, and you leave out the chocolate you may have a cake but you don't have a chocolate cake. In the same vein here, if they charge robbery and they don't prove all of the elements of that crime, then you may have some other crime but you don't have robbery.

In the context of the entire *voir dire* of this prospective juror, we find no prejudice resulted from the conduct of the trial court. *See Eager v. State*, 205 Tenn. 156, 166, 325 S.W.2d 815 (1959).

## VII

The defendant next contends that the trial court erred by admitting the victim's blood type through the keeper of the records for a blood bank. In determining whether there is a violation of the right of confrontation, the court must consider whether the evidence is crucial or devastating, whether the state has made a good faith effort to secure the presence of the person whose statement is to be offered against the defendant, and whether the evidence bears its own indicia of reliability. *State v. Henderson*, 554 S.W.2d 117 (Tenn. 1977); *Dutton v. Evans*, 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970).

In 1979, the victim gave blood to a Jacksonville, Florida, blood bank. The person who did the typing of the victim was unknown. The records custodian stated that the blood type entry was made in the regular course of the organization's business at the time the information was obtained. We do not think the evidence was crucial in this case. It merely corroborated the testimony of the eyewitness to the murder. The knife had already been linked to both the murder and the defendant. The evidence was not offered to prove "an essential element of the crime." *State v. Matousek*, 287 Minn. 344, 178 N.W.2d 604, 608 (1970).

## VIII

The defendant asserts that the trial court committed error by allowing the testimony of a special agent for the TBI who identified a palm print on the knife.

The district attorney general had contacted defense counsel three days before trial to explain the omission of the agent in the list of witnesses provided during discovery. The agent testified that he took the palm print of the defendant and sent it to the agent in charge of the investigation. He was a link in the print's chain of custody. The trial court permitted defense counsel an opportunity to take a statement from the agent before he took the stand. The wrong agent had been listed as a witness. As soon as the state was aware of the mistake, defense counsel was notified.

We find no prejudice.

## IX

■ On both cross-examination and re-direct, the anthropologist who examined the skeletal remains of the victim testified that at least one of the victim's wounds was defensive. He stated that the victim's knee was in a position drawn up next to his chest when the wound was inflicted. The anthropologist rendered the opinion based upon his observations during the examination of the body:

Now there was one blow in which the leg was brought up like this and the blow was such that it cuts through the bone in the hip ... and into the head of the femur.... Now, if you lower the femur, then the cut mark moves away, and so you know the position that the femur was in by lifting this up until you can match up the cut in the head of the femur with the cut in the hip bone and it tells you that the individual had, at least in one of the blows, that the knee was drawn up next to the chest.

The expert concluded that the wound, which he believed was caused by an ax, was defensive in nature.

■ The trial judge has broad discretion in determining the admissibility of expert testimony. *Baggett v. State*, 220 Tenn. 592, 598, 421 S.W.2d 629, 632 (1967). Four factors govern the admissibility of expert testimony of a scientific nature:

(1) the witness must be expert;

(2) the subject matter of the witness' testimony must be proper;

(3) the subject matter must conform to a generally accepted explanatory theory; and

(4) the probative value of the witness' testimony must outweigh its prejudicial effect.

*State v. Williams*, 657 S.W.2d 405, 412, 413 (Tenn.1983).

The expert conceded that his characterization of the wound as defensive was merely his opinion and not definite. He agreed with defense counsel's suggestion that the victim may not have been alive when the blow was struck. By the applica-tion of the *Williams* factors, we think the evidence was admissible.

This issue is without merit.

## X and XI

■ The defendant's last two assertions of error are related. He contends that the trial court should have prohibited the state from displaying an ax, which had not been directly connected to the defendant, to the jury and should have provided curative instructions.

The trial judge granted the defendant's motion *in limine* after a jury-out hearing. The ax was allowed to be marked only for the purpose of identification. After the anthropologist's testimony and in the presence of the jury, the state again moved for introduction of the ax as an exhibit. After defense counsel's objection, the judge only allowed it to be noted for identification purposes. The state's eyewitness never saw an ax. The defendant characterizes his objections on grounds of relevance. If relevant at all, the evidence, the defendant claims, was outweighed by its prejudicial effect.

Dr. William Bass, who examined the body because there was an insufficient amount of soft tissue for a pathologist to examine, found that there were at least three stab wounds and eight ax wounds. Only the blows that damaged the bones could be counted. The ax was found near the pelvic and leg area of the body. Dogs had scattered many of the bones. The ax was found within three to four feet of the major portion of the skeletal remains. The wounds to the skeleton were consistent with having been caused by that particular ax. Rule 401 of the Tennessee Rules of Evidence provides as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 402 provides that relevant evidence is admissible and Rule 403 provides that such evidence, even though relevant, "may be excluded if its probative value is sub-

stantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of accumulative evidence." *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978). We think that the evidence meets the definition of relevancy. Taken in combination with the eyewitness testimony that the defendant had stabbed the victim and had the opportunity to do other injury without being observed by the witness, the location of the ax in proximity to the body was a circumstance the jury might properly consider in relation to the defendant's malice or premeditation. The fact that there may have been repeated blows by an ax is probative. Although the display of a deadly weapon to a jury is almost always somewhat prejudicial, we do not think that the degree of prejudice here "substantially outweighed" the probative value.

Because the evidence was properly admitted, the trial court did not err by refusing to instruct the jury "not to consider [the ax] since there is no evidence to tie [the defendant] with it," as the defendant had requested.

The judgment of the trial court is, therefore, affirmed.

PEAY and TIPTON, JJ., concur.