IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 8, 2007 Session

## STATE OF TENNESSEE v. VANDA WATKINS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-06595    John P. Colton, Judge**

————————————

**No. W2006-01209-CCA-R3-CD  - Filed August 7, 2007**

————————————

The appellant, Vanda Watkins, pled guilty in the Shelby County Criminal Court to reckless aggravated assault, a Class D felony, and pursuant to the plea agreement, received a two-year sentence.  After a sentencing hearing, the trial court ordered that the appellant serve his entire sentence in confinement.  On appeal, the appellant claims that the trial court erred by denying his request for probation.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Randall B. Tolley (on appeal) and John P. Pritchard (at trial), Memphis, Tennessee, for the appellant, Vanda Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tiffani Taylor and Bobby Carter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In September 2003, a Shelby County grand jury indicted the appellant and codefendant Kevin Cain for aggravated assault by use of a deadly weapon against Memphis Police Sergeant Deon Cicinelli.  On June 11, 2004, the appellant pled guilty to reckless aggravated assault and received a two-year sentence as a Range I, standard offender.  On June 5, 2006, the trial court held a sentencing hearing to consider the appellant's motion to suspend the sentence.

At the hearing, Kevin Cain testified that on the night of May 1, 2003, he, Jimmy Dotson, and the appellant decided to go to a night club in Memphis. On the way to the club, the group stopped by a house on Belvedere Street so that Dotson could go in and get some money from someone. Cain backed his car into the home's driveway, which is how he "normally" parked, and Dotson went inside the house. After a few minutes, Cain and the appellant got tired of waiting for Dotson and decided to leave. As Cain started to drive away from the house, a pickup truck pulled in front of his car and hit the car. The truck had tinted windows, and Cain could not see inside.

Cain testified that he had a handgun and pointed the gun at the truck to let the person know he had a firearm. The person shot into Cain's car, and Cain shot back and sped away from the scene. He stated that the incident with the truck lasted thirty-five to forty-five seconds and that he did not know the person in the truck was a police officer. He stated that he was employed full time, was a church member, and turned himself in to police when charges were brought against him. He apologized for his actions and said that if he had known the person in the truck was a police officer, he would have "abided by their rules." He acknowledged that in June 2004, he pled guilty to aggravated assault and evading arrest as a result of the incident.

On cross-examination, Cain testified that the truck pulled up to his car and tried to block his car from leaving the driveway. He stated that he did not see anyone get out of the truck, that he held his handgun up to the windshield of his car, that he heard gunshots, and that he fired back at the truck. The appellant, who was sitting in the passenger seat, immediately "balled up" on the floor but was shot twice. Cain said the appellant did not have a weapon and did not fire a gun. Cain stated that his gun was loaded with seven rounds, that he fired about six shots, and that one of the gunshots struck the police officer. He said he was carrying a gun with him on May 1 because he previously had been a victim of violent crimes. When the pickup truck blocked Cain's car, Cain believed the person in the truck was going to rob or carjack him. Cain acknowledged that his car hit two vehicles as he was trying to escape, but he denied that one of the vehicles had flashing blue lights. He said that he had known the appellant all of his life and that Jimmy Dotson was a friend. However, Cain did not know how Dotson earned a living, if Dotson was involved with drugs, or why Dotson needed to stop by the house to get money. Cain said he later learned Dotson had gone into the house to conduct a drug transaction involving Ecstasy.

The appellant testified that on the night of May 1, 2003, he was a passenger in Kevin Cain's car. Cain, the appellant, and Jimmy Dotson stopped by a house on Belvedere Street so that Dotson could get some money. Cain backed his car into the driveway, and Dotson went inside. The appellant noticed a gold pickup truck parked across the street and kept telling Cain that somebody in the truck was probably planning to rob or carjack them. The appellant suggested that Cain drive away and leave Dotson at the house. As Cain started to leave, the gold truck hit the front of Cain's car, and the appellant immediately "balled up." He stated that he heard gunshots, that he was shot in the hand, and that a bullet grazed his back. The appellant said he was "just ducking trying to cover and protect myself" and that he went to a hospital for treatment after the shooting. He stated that he did not fire any shots and that he would have been killed if Cain had not had a gun that night. The appellant said that although he did not have a gun, he pled guilty in order to dispose of the case

-2-

quickly and to request probation. He stated that he owned a lawn service business and was a performing singer. He acknowledged that he had prior convictions for misdemeanor possession of marijuana and a traffic offense.

On cross-examination, the appellant testified that when they arrived at the house on May 3, a woman came outside, tapped on the car window, and spoke with Dotson. However, the appellant did not pay any attention to their conversation. Dotson and the woman then went inside the home. The appellant did not see any vehicles other than the gold truck pull up to Cain's car. As soon as the shooting started, the appellant did not look up to see what was going on because he was afraid. He stated that he never saw Cain pull out a gun and that he did not know who fired the first shot. After Cain sped away from the scene, the car became inoperable. The appellant did not telephone the police but telephoned his girlfriend and told her to take him to the hospital. While the appellant was being treated at the hospital, hospital staff called police. After the shooting, the appellant learned that Dotson was a drug dealer and that the man in the gold truck was a police officer. The appellant acknowledged that his prior drug conviction involved a gun and four hundred pounds of marijuana. He stated that in that case and in this case, he was in the "[w]rong place at the wrong time." He said that when he and Cain decided to leave Dotson at the home on Belvedere Street, they planned to return to the home when Dotson called them. He stated that he previously had been carjacked twice and robbed four times.

Memphis Police Department Sergeant Deon Cicinelli testified for the State that in May 2003, he was a team leader for a drug unit and was working on an Ecstasy case. Sergeant Israel Taylor had set up a drug deal and was working undercover to buy five hundred Ecstasy pills. On May 1, 2003, police officers "wired" Sergeant Taylor in order to monitor the drug transaction, and Sergeant Taylor went to the house on Belvedere Street. Nine to twelve officers, including Sergeant Cicinelli, were waiting outside. Sergeant Cicinelli stated that the officers were waiting for Sergeant Taylor to give a signal for them to enter the house and "do the take down."

Sergeant Cicinelli testified that he was sitting outside in a brown Ford Explorer pickup truck with tinted windows and that the truck was parked across the street from the "target house." Sergeant Cicinelli saw Kevin Cain's car arrive at the target house and back into the driveway. A woman came out of the house and got into the backseat of Cain's car. The woman and Dotson then got out of the car and went into the house. Sergeant Cicinelli could hear Sergeant Taylor negotiating with Dotson about the price of the pills. Dotson "tried to get Israel to come outside to the car to talk to his partners for a set price," and Sergeant Cicinelli became concerned that Sergeant Taylor was going to be robbed. Sergeant Taylor gave the take-down signal, and Sergeant Cicinelli immediately turned on his truck's headlights. He saw Cain and the appellant look at him as he drove across the street, and he parked his truck in front of Cain's car. Sergeant Cicinelli stated that he opened the door of his truck and saw that Cain and the appellant had handguns. Sergeant Cicinelli stepped out of the truck, and gunshots immediately were fired at him from Cain's passenger side window. Sergeant Cicinelli fired two shots back at Cain's car as it sped away.

Sergeant Cicinelli testified that his truck never made physical contact with Cain's car. However, as Cain drove away, his car struck Detective J. R. Green's pickup truck, which had arrived at the scene, and a Subaru parked on the street. The strobe lights on Detective Green's pickup were flashing, and a blue light was on the truck's dashboard. Sergeant Cicinelli did not know if the blue light in Detective Green's truck was flashing at the time of the incident. He stated that he was wearing his take-down uniform, which consisted of all-black clothing and a black bulletproof vest that had "police" in white lettering on the front and back. He also was wearing a hat with "police" printed on the front and a neck flap to protect his throat. One of the gunshots fired from Cain's car ricocheted off the gold truck's front fender and struck Sergeant Cicinelli's neck flap, one inch from his Adam's apple. He said the neck flap saved his life. Cain's car "totaled" Detective Green's pickup truck, and police later found the car near the crime scene.

Sergeant Cicinelli testified that shots were fired at him first and that he returned fire. He estimated that more than six shots were fired from Cain's car and assumed that Cain and the appellant shot at him. He stated that when he first pulled up to Cain's car, he was only planning to detain Cain and the appellant. As Sergeant Cicinelli got out of his truck, he yelled "police." He stated that both of the defendants "need to serve their sentence. Probation would be a slap in the face."

On cross-examination, Sergeant Cicinelli testified that the police later found Ecstasy pills in the house but not in Cain's car. He acknowledged that his gold pickup was unmarked, that no marked patrol cars were at the scene, and that it was very dark outside. He said he could not be sure if both of the suspects in Cain's car shot at him.

According to the appellant's presentence report, the then twenty-nine-year-old appellant was single and had a seven-year-old son and a six-year-old daughter. In the report, the appellant described his mental health as excellent and his physical health as fair. He reported that he was not taking any medications and that he used alcohol socially. The report shows that the appellant began working as a rap singer for Relativity Records in 1996. At the time of the report, he had a record label contract with Big Daddy Entertainment. Prior to working as a rap artist, the appellant was employed as a salesperson for Big Dawg's Beeper Shop and The Commercial Appeal. According to the report, he pled guilty to misdemeanor possession of drugs in 2002 and served one day in jail. In 1997, he pled guilty to a traffic offense.

The trial court noted that it had reviewed the appellant's presentence report and stated that Kevin Cain "on some matters appeared to be candid, on some he did not." The court also stated that although the appellant claimed "he was just a passenger in the case," Sergeant Cicinelli testified that both of the defendants had handguns. The court also noted that Sergeant Cicinelli's bulletproof vest had "police" printed on the front and back and said that it believed Cain and the appellant knew the victim was a policeman. The court stated that this was a violent case and that more people could have been hurt or killed. The court concluded that the appellant was a danger to society and denied his motion to suspend the sentence.

## II.  Analysis

The appellant contends that the trial court "overlooked" the sentencing principles regarding probation and "seemed to go on . . . its view of this particular offense."  The appellant claims that the trial court improperly relied on deterrence to deny his request for probation and that full probation is warranted in this case because "[i]t is clear in the record that your appellant never had a gun or any intent to harm anyone and only to protect himself and was a victim that night of a shooting."  Finally, the appellant argues that "[t]o deny probation because a police officer was involved in a drug deal gone bad is terribly unfair."  The State contends that the trial court properly denied the appellant's motion to suspend the sentence.  We agree with the State.

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d).  In conducting our de novo review, this court considers the following factors:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Initially, we recognize that an appellant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. See Tenn. Code Ann. § 40-35-303(a) (2003).[1]  Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing.  See Tenn. Code Ann. § 40-35-102(6) (2003).  In the instant case, the appellant is a Range I, standard offender convicted of a Class D felony; therefore, he is presumed to be a favorable candidate for alternative sentencing. However, this presumption may be rebutted by "[e]vidence to the contrary." State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996).  The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

---

[1] Effective June 7, 2005, the legislature amended several provisions of the Criminal Sentencing Reform Act of 1989.  However, the appellant committed the crime in this case before June 7, 2005, and nothing in the record indicates that he elected "to be sentenced under the provisions of the act by executing a waiver of his ex post facto protections."  Tenn. Code Ann. § 40-35-114, Compiler's Notes.  Therefore, the 2005 amendments do not affect the appellant's case, and we have cited the statutes that were in effect at the time the appellant committed the offense.

    (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Zeolia, 928 S.W.2d at 461. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence was imposed. See Tenn. Code Ann. § 40-35-103(2), (4). Further, the "potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5).

   Initially, we note that the appellant failed to include the guilty plea hearing transcript in the appellate record. The failure to include the transcript prohibits this court from conducting a full de novo review of the sentence under Tennessee Code Annotated section 40-35-210(b). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Nevertheless, based upon the record before us, we conclude that the trial court properly denied the appellant's request for probation.

   The trial court's explanation for denying probation reflects that it believed the circumstances of the offense weighed heavily against the appellant's request. We agree. Cain and the appellant drove Jimmy Dotson to the home on Belvedere Street in order for Dotson to sell Ecstasy pills to Sergeant Taylor. While Cain and the appellant waited in the car, they noticed Sergeant Cicinelli's truck parked across the street, became suspicious, and decided to leave. Before Cain could drive away, Sergeant Cicinelli received the take-down signal and used his truck to block Cain's car. Sergeant Cicinelli, wearing a bulletproof vest marked "police," stepped out of his truck, was immediately fired upon from Cain's car, and was struck in the neck. He stated that when he stepped out of his truck, he saw that both the appellant and Cain had handguns. Although the appellant testified that he did not have a gun and did not shoot at Sergeant Cicinelli, the trial court obviously accredited the victim's testimony over that of the appellant. The trial court did not specifically mention the need for general deterrence. However, just one year earlier, the appellant used a gun to participate in a drug transaction involving four hundred pounds of marijuana. Thus, we believe there is a need for specific deterrence in this case. See State v. Hooper, 29 S.W.3d 1, 12 (Tenn. 2000). Finally, as noted in the State's brief, the appellant continues to maintain that he did not shoot at the victim and was merely "in the wrong place at the wrong time." As this court has repeatedly stated, such denial reflects poorly on a defendant's potential for rehabilitation. Therefore, given the circumstances of the offense, the need for deterrence, and the appellant's poor potential for rehabilitation, we conclude that the trial court properly denied his request to suspend the sentence.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE