IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2007

## STATE OF TENNESSEE v. RONALD BROWN

**Direct Appeal from the Circuit Court for Maury County**
**Nos. 14231-33, 14235     Stella Hargrove, Judge**

_____

**No. M2006-02783-CCA-R3-CD - Filed October 9, 2008**

_____

Ronald Steven Brown, the defendant, was convicted of the following offenses under four separate indictments: No. 14233, attempted first degree murder (Class A felony); No. 14232, attempted second degree murder (Class B felony) and assault (Class A misdemeanor); No. 14235, aggravated assault (Class C felony); and No. 14231, felony evading arrest (Class E felony) and DUI, first offense (Class A misdemeanor). The defendant was sentenced as a standard offender to an effective sentence of forty-three years, consecutive to a ten-year federal sentence. On appeal, the defendant alleges error in four areas: (1) The failure of the State court reporter to preserve transcripts of the pretrial motions and sentencing hearing violated his right of due process: (2) The trial court imposed an excessive sentence; (3) The trial court permitted the State to amend an indictment over his objection after the jury was sworn; and (4) He was sentenced in violation of *Gomez v. Tenn.*, 127 S. Ct. 1209 (2007). After careful review, we conclude that the defendant is not entitled to any relief and affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Claudia S. Jack, District Public Defender, and Robin Farber and Michelle Vanderee, Assistant Public Defenders, for the appellant, Ronald Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Senior Counsel; T. Michel Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The evidence at trial reflected that the defendant was in an "off and on" relationship with the victim that lasted more than twenty years. The victim decided to end this relationship in October 2003 but continued to see him. On November 4, 2003, the victim went to work as usual and spoke

to the defendant while she was at work; all appeared normal. Later that afternoon, a friend of the victim received a phone call from the defendant, who stated that he was looking for the victim. The friend found it odd that the defendant was looking for the victim when she was at work. The defendant told the victim's friend that the victim did not love him anymore and that he had nothing to live for.

After the victim arrived home from work, she was talking to her friend on the telephone when the defendant also phoned her. She answered his call through call waiting and refused to pick him up. The victim was still talking on the telephone with her friend when the defendant arrived at the victim's home unannounced. The defendant entered the victim's bedroom and sat down in a recliner. The victim finished her telephone conversation with her friend and hung up the phone. The defendant stood up, told her that "tonight, I'm going to send you to meet your maker," and hit her on top of her head with a handgun.

The victim begged the defendant not to hurt her but he told her he was going to shoot her and then shoot himself. The victim said that the defendant was intoxicated, visibly upset, and crying and that she tried to calm him down. The victim eventually convinced the defendant to put the handgun away, and he slid it under the bed. The victim told the defendant that she wanted to go eat. They left the house, and the victim left the door to the house open so someone could retrieve the gun while they were out.

The victim and the defendant picked up the victim's friend while they were out and proceeded to a restaurant. The defendant fell asleep in the car, and the victim and her friend went inside. The victim told her friend what had happened, and they tried to call someone to get the handgun. They returned to the car and went back toward the victim's house. They stopped at a tavern where the defendant's daughter worked, and the daughter followed them to the victim's home. The defendant's daughter got the handgun and returned to work, where she placed the handgun under a rock outside the tavern.

The defendant later went to the victim's bedroom and asked if she had gotten rid of his gun. The victim went to the bathroom, inspected her injured head, showed the defendant her injury, and said she needed to go to the hospital. The defendant asked her not to tell the police. As the victim and her friend were leaving, the defendant said something about the victim being in trouble and having something that belonged to him.

The defendant went to the tavern and asked his daughter if she had his handgun. She told him where to find it.

The victim telephoned one of her sisters and described what had happened. She was then met at the hospital by her two sisters, a niece, a cousin, and an aunt. The victim told the emergency room workers what had happened, and they called the police. The victim received six or seven stitches for her injury. The victim spoke with police after she was released.

The victim left the hospital and planned to go home with one of her sisters. They went to the victim's home so she could get some clothes. The police arrived with an arrest warrant for the defendant but were told he was not at the house. As the victim and her family were preparing to leave, the defendant arrived and tried to block the victim's car in the driveway. The victim escaped in a vehicle but was pursued by the defendant. During the car chase, the defendant passed their car, told them to "stop that mother-fucking car," and then fired two gunshots at the victim's car. The victim's sister, who was driving the car, yelled out that she had been shot and stopped the car. The defendant fled the scene before the police arrived.

The Columbia Police Department officer, who was dispatched to investigate the shooting, inspected the victim's car and observed two bullet holes in the front and back doors, respectively. He dispatched other officers to further investigate the defendant. At 11:59 p.m., a Spring Hill Police Department officer received a bulletin to be on the lookout for the defendant's car. He spotted the car and followed it for a long time before alerting another officer to assist him in initiating a stop. When they turned on their blue lights, the defendant's car accelerated to 87 miles per hour while the chase went through 45 and 35 miles-per-hour zones. The defendant signaled his turns and sped through a 20 miles-per-hour zone at the rate of 61 miles per hour. Even though the chase continued for some time, the defendant did signal his turns as he continued to speed and run stop signs. The defendant pulled into a parking lot and drove his car in the direction of one of the officers. The officer testified that he had to back his car up to avoid being hit and that the defendant looked at him as he passed very close to his car.

The officers pursued the defendant until he pulled into a driveway. One of the officers attempted to follow but drove into a ditch. The defendant drove into the back yard, around the house next door, and then re-entered the street at a high rate of speed nearly hitting the officer who was not in the ditch.

The defendant finally stopped the car in the backyard of a home. The officers ordered him to "get down" but, instead, he fired his handgun at them. One of the officers returned fire seven times until he knocked the defendant to the ground. They rushed to the defendant and quickly disarmed him. The officers then called for an ambulance and LifeFlight helicopter because the defendant was bleeding badly. The defendant's blood-alcohol content was .09 at 1:48 a.m.

Other testimony demonstrated that the defendant fired the handgun four times and that he had pulled the trigger a fifth time but the hammer dropped on an empty cylinder.

The jury convicted the defendant of the aggravated assault of the victim, simple assault on the officer who was almost hit by the defendant's car, attempted second degree murder of the officer he tried to shoot, and attempted first degree murder of the victim's sister.

The trial court conducted a separate sentencing hearing and found that the defendant needed a lengthy sentence in order to protect society, to avoid depreciating the seriousness of the offenses, and to provide an effective deterrence.

The defendant filed a motion for new trial and, during the hearing, the trial court expressed concern about presenting a complete appellate record for the defendant's appeal. The State court reporter was not able to produce a transcript from the sentencing hearing, and the trial court asked both parties to supply information to the trial court in an attempt to "re-create" the sentencing hearing. At the hearing on the motion for new trial, defense counsel acknowledged that all the information had been supplied to the court and that the defendant had no reason to believe the compiled sentencing memorandum was not a "proper conglomeration of all of our thinking."

Analysis

The State court reporter in this case could not produce transcripts of the pretrial motions or the defendant's sentencing hearing. The defendant argues that, as a result of this failure, he is entitled to a new trial. The defendant cites *Howard v. State*, 399 S.W.2d 738, 739, in support of his argument. However, *Howard* involved the failure of a trial judge to sign a guilty verdict and the order overruling a new trial motion. This does not correlate to the issue at hand. Furthermore, this court has held that the failure of the trial judge to sign these documents does not render a judgment void under the holding of *Howard*. *Jerry L. Johns v. State*, No. E1999-00260-CCA-R3-CD, 2000 Tenn. Crim. App LEXIS 208, at *5 (Tenn. Crim. App. at Knoxville, Mar. 19, 2000); *Rogers Lamont McKinley v. State*, No. 03C01-9308-CR-00255, 1994 Tenn. Crim. App. LEXIS 533, at *4 (Tenn. Crim. App. at Knoxville, Aug. 17, 1994). We conclude that *Howard* offers no support for the defendant's argument in this issue.

The defendant also urges that he is entitled to a new trial based on due process considerations. The defendant states that the minimum standards of due process, as set forth *in Matthews v. Eldridge*, 424 U.S. 319, 325, 96 S. Ct. 893, 898 (1976), were violated by the loss of the transcripts, subsequently preventing or severely hindering his appeal.

We are unpersuaded by the defendant's arguments on this issue. Although the defendant herein was indigent, it is only the State's duty to provide indigents an adequate and effective record as are available to non-indigent defendants with similar contentions. *Draper v. Washington*, 372 U.S. 487, 496 (1963). The loss of the transcripts in this case had no relation to the defendant's indigence.

Tennessee Code Annotated section 40-14-307(a), subject to the definitions contained in Tennessee Code Annotated section 40-14-301, provides that in all felony cases in the trial courts of Tennessee:

> [a] designated reporter shall attend every stage of each criminal case before the court and shall record verbatim, by a method prescribed or approved by the administrative director, all proceedings had in open court and other proceedings as the judge may direct. The reporter shall attach the reporter's official certificate to the records so taken and promptly file them with the clerk of the court, who shall preserve them as a part of the records of the trial.

-4-

Rule 24(c) of Tennessee Rules of Appellate Procedure provides for situations in which no transcription of the evidence or the proceedings is available:

> If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

(emphasis added). The ultimate resolution of any differences between the parties is addressed in Tennessee Rule of Appellate Procedure 24(e) and (f).

The defendant did not comply with the above provisions by preparing a statement of the evidence. The defendant cannot simply rely on the failures or omissions of the reporter but must comply with the provisions of Tennessee Rule of Appellate Procedure 24. The defendant has failed to do so and, likewise, failed to demonstrate any violation of his due process rights.

## Alleged Error in Sentencing

The defendant next contends that the trial court failed to comply with the sentencing act and imposed an excessive sentence. The defendant, in his argument, relies heavily on the fact that the court reporter could not produce a record of the sentencing hearing.

We do not recite the well-established standard of review for appellate review of the length and manner of sentencing, as our conclusion is not based thereon. Although the trial court produced a memorandum of its findings, the defendant argues correctly that this is insufficient for appellate review. As stated in the first issue, it is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what transcribed in the trial court with respect to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence. *Oody*, 823 S.W.2d at 559. In reviewing a challenge to the length of individual sentences or imposition of consecutive sentences, an appellate court conducts a *de novo* review on the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d). The defendant admits his eligibility for consecutive sentences. Due to the defendant's own failure to comply with Tennessee Rule of Appellate Procedure 24, we are left with an inadequate record to rebut the presumption that the actions of the trial court were correct. We affirm the sentence as imposed.

## Indictment Amendment

The defendant's third issue alleges that the trial court erred by permitting the State to amend an indictment after the jury had been sworn. The defendant's reliance is on Rule 7 of the Tennessee Rules of Criminal Procedure, which states in pertinent part:

> (a) General Provision. – The definition, form, use, return, endorsements, content, and procedure relating to indictments, presentments, and criminal information are as provided by law.
> (b) Amending Indictments, Presentments and Information. –
> > (1) With Defendant's Consent. – With the defendant's consent, the court may amend an indictment, presentment, or information.
> > (2) Without Defendant's Consent. – Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

We do not question the integrity of the defendant's representation; however, the only reference in support of such an amendment is the defendant's motion for a new trial. As with the previous issues, the appellate record of this is not present.

It is the duty of the accused to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). Without further supporting documentation, we cannot rely on a mere allegation contained in a motion for new trial to afford relief. Accordingly, this issue is waived due to the defendant's failure to provide a complete account of what transpired in the trial court. Instead, we must presume the trial court's rulings were proper. *Oody*, 823 S.W.2d at 559.

### Sentencing

The defendant's last issue alleges that the defendant was sentenced in violation of the dictates of *Gomez v. Tenn.*, 127 S. Ct. 1209 (2007). In his brief, the defendant argues that the sentence was enhanced, based on factors not found by a jury, but candidly admits that "there is no record of this."

As in the preceding issues, the defendant is thwarted by the lack of a complete record for our review. This situation has been previously explained in this decision as one of the defendant's own making. We are compelled to view the sentencing issue as waived for the lack of a complete record.

### Conclusion

In this case, the court reporter was unable to produce key sections of the trial transcript, including pretrial motions and the sentencing hearing, which were necessary for appellate review. The defendant merely relied on the court reporter's error rather than complying with Rule 24(e) of

Tennessee Rules of Appellate Procedure and initiating an attempt to reconstruct the record. The defendant's failure was fatal to all issues raised on appeal; therefore, we affirm the judgments from the trial court.

 

_____
JOHN EVERETT WILLIAMS, JUDGE