IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 7, 2003

## STATE OF TENNESSEE v. WILLIAM HERBERT STITTS

**Direct Appeal from the Circuit Court for Madison County**
**No. 01-734     Donald H. Allen, Judge**

---

**No. W2002-01903-CCA-R3-CD  - Filed February 24, 2004**

---

The appellant, William Herbert Stitts, was convicted by a jury in the Madison County Circuit Court of two counts of robbery, Class C felonies. Following a sentencing hearing, the trial court sentenced the appellant on each count as a Range II multiple offender to ten years incarceration in the Tennessee Department of Correction, to be served consecutively to one another and consecutively to sentences for previous, unrelated convictions. On appeal, the appellant asserts that (1) the evidence was insufficient to sustain his conviction of robbery as charged in count one of the indictment, and (2) the sentence imposed by the trial court was excessive. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA McGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); George Morton Googe, District Public Defender (at trial and on appeal); and Vanessa D. King, Assistant District Public Defender (at trial), for the appellant, William Herbert Stitts.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On the evening of December 16, 1998, Darlene Tosh was working as a clerk at Mike's Raceway, a convenience store located on the corner of Airways and South Highland in Jackson. At trial, Tosh testified,

[I]t was just a normal evening by myself, and this gentleman walked in. He was just walking around the store . . . , taking his time. And all of a sudden he come [sic] up to my register and he had like a 50-cent [piece of] candy. . . . When I went to open the register, he come [sic] over with his hand real fast and he started grabbing my money out of my register. . . . [I] tried to stop him. And he jerked. And when he jerked, he jerked all the money and then he took off running.

Tosh testified that when the man reached for the cash register, she thought, "Oh, no, not again." Quickly, she grabbed the man's hand in an attempt to stop him, but the man "jerked real quick," taking more than one hundred dollars ($100) from the cash register drawer before running out of the store. Tosh related that the man did not have a weapon, and she was not harmed during the robbery. Nevertheless, the man did not have permission to take the money from the register.

After the man left, Tosh called the police, who arrived shortly thereafter. The next day, Investigator Golden asked Tosh to view a photographic lineup, and she identified the appellant as the perpetrator of the offense. Tosh identified the appellant at trial, both in person and in photographs produced from the video surveillance camera located in the store. She explained that the photographs reflected her attempt to prevent the appellant from taking the money from the cash register.

On cross-examination, Tosh admitted that she recognized the appellant because he had previously been in the store. She conceded that the appellant did not threaten her and she had not been afraid of the appellant. In fact, she had initiated the physical contact by grabbing the appellant's hand.

That same evening, Francheska Davis was working at the Little General Store on the corner of Old Hickory and Hollywood in Jackson. At trial, Davis testified that "[a] gentleman came into the store and shopped around for awhile and ended up getting just a 25-cent pack of gum. And when I rang it up and opened the drawer, he shoved me back into the wall and he just grabbed all the money." Davis testified that the man shoved her so hard that she fell. He then took the money from the drawer of the cash register and lifted the drawer to take the checks and larger bills kept underneath. However, because the larger bills had been put in the safe, the appellant "only got like $98.00 . . . [and] a lot of checks." After taking the money, the man ran out of the store and got into a car that was parked nearby.

After the man left, Davis alerted her manager, who was standing outside, and her manager notified the police. When the police arrived, Davis told them what had happened. Approximately two weeks later, Investigator Golden asked her to view a photographic lineup, and she identified the appellant as the individual who robbed the Little General Store. Davis identified the appellant at trial, both in person and in photographs produced from the video surveillance camera located in the store. Davis testified that she knew the appellant because they "grew up together." Nevertheless,

she was frightened by the incident and did not attempt to stop the appellant. She stated that the appellant "acted like he had [a weapon], but . . . I didn't see one."

Cassandra Williams was also working at the Little General Store on December 16, 1998. At trial, she testified,

> [Davis and I] were getting ready to close and clean up, and [the appellant] came in. He walked around until everybody left [the store]. . . . [H]e was going to purchase a pack of gum for twenty-five cents. Well, [Davis] opened up the drawer. That's when he pushed her.
>
> . . . .
>
> After he pushed her, he reached over the counter and grabbed the money out of the drawer. And then he jumped back from the counter, and he went in his pocket like he was going to pull a gun. And that's when I took off running.

When Williams heard the appellant leave, she returned to help Davis, who had fallen after being pushed by the appellant. Although the appellant had frightened Williams, he had neither spoken to nor touched her. At trial, Williams identified the appellant as the individual who robbed the Little General Store.

Sergeant Robert Henson of the Jackson Police Department testified that on December 16, 1998, at 5:45 p.m., he responded to a robbery call at Mike's Raceway. When he arrived at the scene, he spoke with the clerk and took her statement. Upon learning that the convenience store had a video surveillance camera, Sergeant Henson viewed the video recording of the robbery and obtained a description of the suspect. Sergeant Henson did not come into contact with the appellant that evening.

Sergeant Matthew Hardaway of the Jackson Police Department testified that on December 16, 1998, at 10:16 p.m., he responded to a robbery call at the Little General Store. When he arrived at the scene, he took the clerk's statement and obtained a description of the suspect. Thereafter, Sergeant Hardaway asked if the convenience store was equipped with a video surveillance camera. He then viewed the video recording of the robbery and took the videotape into custody. Sergeant Hardaway testified that he never came into contact with the appellant. Moreover, he was unable to recall whether, at the time he responded to the call, he knew that another robbery had occurred in that area earlier that evening.

J.R. Golden, an investigator with the Violent Crimes Unit of the Jackson Police Department, testified that on December 17, 1998, he was assigned to investigate the robberies of Mike's Raceway and the Little General Store and was "led to a suspect." Investigator Golden prepared a photographic

lineup which he presented to Tosh and Davis individually. Both women identified the appellant as the man who robbed the respective convenience stores.

Investigator Golden subsequently viewed the videotapes obtained from the convenience stores by Sergeants Henson and Hardaway. From the recordings, Investigator Golden had still photographs produced, which photographs reflected the robberies in progress. At trial, Investigator Golden testified that the photographs accurately reflected "the still shots from the video[s]." The photographs and the videotapes were entered into evidence and viewed by the jury.

On cross-examination, Investigator Golden admitted that he knew the appellant's family. He related that the appellant had six or seven brothers; however, he was unable to recall whether the appellant and his brothers had similar features. Investigator Golden conceded that a statement was not obtained from Cassandra Williams, but he stated that in the police report she was noted as being present during the robbery of the Little General Store. Investigator Golden testified that he did not know whether crime scene technicians had gathered evidence or fingerprints from the convenience stores following the robberies.

Based upon the foregoing evidence, the appellant was convicted by the jury of two counts of robbery. Following a sentencing hearing, the trial court sentenced the appellant on each count to ten years incarceration, to be served consecutively to one another and consecutively to sentences for previous, unrelated convictions. On appeal, the appellant asserts that 1) the evidence was insufficient to sustain the appellant's conviction of robbery as charged in count one of the indictment and 2) the trial court erred by imposing consecutive sentences.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant first challenges the sufficiency of the evidence to support his conviction of robbery as charged in count one of the indictment. Specifically, the appellant asserts that because the State did not show that the appellant took the money by violence or by placing Tosh in fear, the evidence supports only a conviction of the lesser offense of theft. The State contends that, taken in the light most favorable to the State, the evidence was sufficient to support the conviction of robbery.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. Id. This court will not reweigh or reevaluate the evidence. State v. Grace, 493 S.W.2d 474,

476 (Tenn. 1973). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence *or* putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997) (emphasis added). Tennessee Code Annotated section 39-14-103 (1997) provides that "[a] person commits theft of property if, with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent."

The appellant was charged in count one of the indictment with robbery "by putting in fear and/or by violence." However, at trial, Tosh testified that she knew the appellant and was not afraid when he reached into the cash register. Accordingly, in order to sustain a conviction for robbery on count one, the State was required to prove the element of violence.

In State v. Fitz, 19 S.W.3d 213, 216-17 (Tenn. 2000), our supreme court examined what evidence constituted proof of "violence." The court concluded that the plain meaning of the element of violence as used in the offense of robbery pursuant to Tennessee Code Annotated section 39-13-401 was "physical force unlawfully exercised so as to injure, damage or abuse." Id. at 217; see also State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002). The court explained that "violence and force are obviously related but not synonymous–in effect, violence is a more severe degree of force. Stated another way, a violent act necessarily involves force but a forcible act does not necessarily involve violence." Fitz, 19 S.W.3d at 216. For example, the "theft of a wallet from the pocket or purse of an unknowing or unresisting victim . . . may require 'compulsion by the use of physical power' but not violence." Id. at 217 (citing Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 8.11(d), at 781 (2d ed.1986)).

At trial, Tosh testified that when the cash register opened, the appellant reached across the counter "real fast and . . . started grabbing [the] money out of [the] register." Tosh stated that she attempted to stop the appellant by grabbing his hands. However, the appellant "jerked real quick," taking the money from the register and running out of the store. Tosh testified that she was not injured as a result of the incident.

In denying the appellant's motion for judgment of acquittal at the close of the State's case-in-chief, the trial court stated,

> Now with respect to Count 1 of the indictment, the proof is . . . not quite as clear and not quite as strong with respect to this property being taken by any type of fear or by violence. Quite clearly, Ms. Tosh, the alleged victim on Count 1, testified that she was not placed in fear. . . . I looked at this issue very closely when I listened to Ms. Tosh's testimony, and I watched . . . the videotape very closely to see

-5-

what physical force was being used or what violence was being used to take the property. Now as Ms. Tosh testified to, what happened was that after the [appellant] approached the counter and after [Tosh] . . . pressed the button and the cash drawer came open [the appellant] reached across the counter, began taking or attempting to take money out of the cash drawer. Now at that point, [Tosh] says she reached to grab his hands . . . as his hands were taking money out of the cash drawer. And it would appear on the videotape, and it does appear from her testimony . . . that she is the one who initiated contact with the [appellant]. But when you look at the term "violence" as defined under the Robbery statute, "violence" means evidence of physical force unlawfully exercised so as to damage, injure, or abuse. Now, obviously, there was some physical force involved in this situation because obviously when he reached across the counter and he placed his hands into the cash drawer she did make some effort to stop him from taking the money. . . . He simply was still in the process of taking money from the cash drawer, and that's when she attempted to stop him from taking this money. Now, obviously, at that point, the [appellant] did in some fashion resist because he pulled his hands away. . . . And in order to get away with this theft, he did have to use some physical force in order to get away. He had to pull his arms away from her and pull the money out of the cash drawer. . . . Because of that . . . it would appear that . . . this actual taking of the property was contemporaneous with this physical force that was being exerted to try to prevent him from taking this property.

And because of that, . . . there does appear to be sufficient evidence . . . that a jury could find him guilty of taking this property by violence and by physical force.

The trial court applied the same reasoning in denying the appellant's motion for new trial on this issue. In so finding, the trial court appeared to rely heavily on the videotape of the robbery. However, the videotape was not made a part of the record on appeal. The absence of an adequate record prevents appellate review of this issue.

The appellant bears the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. See Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). In the absence of an adequate record on appeal, this court must presume that the trial court's ruling was correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981). Thus, we must presume that the judgment of the trial court is correct.

B.  Sentencing

Next, the appellant maintains that the trial court erred by ordering the appellant to serve his sentences for robbery consecutively.  Specifically, the appellant asserts that he did not qualify as a "dangerous offender" as required by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995).[1]  The State contends that the record supports the imposition of consecutive sentences.

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-401(d) (1997).  However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment.  Tenn. Code Ann. § 40-35-102 and -103 (1997), -210 (Supp. 2002); see also Ashby, 823 S.W.2d at 168.  The burden is on the appellant to show that the sentence is improper.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

In the present case, the record reflects that the trial court complied with the statutory sentencing principles and procedures.  The trial court considered the nature of the offense, the arguments of counsel, the presentence report, and the testimony presented at trial and at sentencing.  Based upon this information, the trial court sentenced the appellant on each count as a Range II multiple offender to ten years incarceration, to be served consecutively.  The trial court also ordered that the appellant serve the sentences consecutively to sentences for previous, unrelated convictions.

Tennessee Code Annotated section 40-35-115 (1997) provides that a trial court may impose consecutive sentences if the defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that:

---

[1] In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, was not sufficient to sustain consecutive sentences.  If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors."  Id.  The trial court made these findings in the instant case.

(1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal attempt.

In the instant case, the trial court stated that the imposition of consecutive sentences was based upon its finding that the appellant was a professional criminal, had an extensive criminal record, and was a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(1), (2), and (4). As previously stated, the appellant asserts that he did not qualify as a "dangerous offender." However, we need not address whether the trial court erred by finding the appellant to be a professional criminal or a dangerous offender. The trial court also found that the appellant had an extensive criminal record. Our review of the presentence report reflects that the appellant had numerous prior felony convictions, including three convictions for aggravated robbery. Thus, the appellant's prior criminal record alone supports consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). This issue is without merit.[2]

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[2] Although the appellant does not appear to challenge the imposition of consecutive sentencing with regard to the appellant's prior convictions, we note that the appellant was on parole for those convictions when he committed the instant offenses. Accordingly, consecutive sentences were mandated by Rule 32(c)(3) of the Tennessee Rules of Criminal Procedure.