# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July12, 2006

## STATE OF TENNESSEE v. LISA MARIE BUTLER

**Appeal from the Criminal Court for Shelby County**
**No. 04-00222     Chris Craft, Judge**

_____

**No. W2005-01964-CCA-R3-CD  - Filed November 7, 2006**

_____

A Shelby County jury convicted the defendant, Lisa Marie Butler, of first degree felony murder and aggravated child abuse, *see* T.C.A. §§ 39-13-202, -15-402 (2003), in connection with the June 17, 2003 death of her eight-month-old child, Dewayne Butler.  The trial court sentenced the defendant as a Violent Offender to life imprisonment at 100 percent for the felony murder conviction and to 20 years and six months at 100 percent for the aggravated child abuse conviction, with concurrent service of the sentences.  On appeal, the defendant contests the legal sufficiency of the convicting evidence at trial and argues that her sentence for the aggravated child abuse conviction is excessive.  After our review of the record and the parties' briefs, we affirm the defendant's convictions.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Jones, District Public Defender, and Trent Hall, Assistant Public Defender (at trial); and Phyllis Aluko, Assistant Public Defender (on appeal), for the Appellant, Lisa Marie Butler.

Paul G. Summers, Attorney General & Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Viewed in the light most favorable to the State, the evidence at trial disclosed that in 2003, Dewayne Holloway lived in a two bedroom apartment at 400 South Lauderdale in Shelby County.  Holloway's girlfriend, the defendant, lived with him as did two of Holloway's children, four-year-old Joshua Holloway and eight-month-old Dewayne Butler.  The defendant was the infant's mother.

Holloway had full-time employment as an automotive technician at Inside Out Transmission where his work schedule was "basically nine to five." On June 17, 2003, Holloway went to work at 8:00 a.m. and left work at approximately 4:30 p.m. He planned to go home, dress, and then attend the ceremony for his graduation from Tennessee Technology Center, where he had completed automotive technology classes. Holloway testified that the defendant and the infant victim had accompanied him to work that day, and on the way home, Holloway stopped "at a couple of places" looking to purchase film for the defendant's camera because she had agreed to take photographs at Holloway's graduation. Holloway was unable to locate camera film, and because he needed to go home and dress, he declined to stop at any other places. Holloway stated, "And after we couldn't find film, . . . [the defendant] just kind of got upset."

When the group arrived at the apartment, Holloway noticed that his teenage children, Christopher and Phoenix, were sitting and waiting on the porch. The defendant went directly into the apartment, leaving the victim in his car seat. Holloway removed the victim from his vehicle, and Phoenix carried him into the apartment. Holloway then carried the victim to the upstairs bedroom and placed him in a playpen that also served as the victim's crib. Holloway prepared to take a shower, but first he asked the defendant to clean his shoes. The defendant "basically said no," and Holloway asked his son Christopher to perform the task. Holloway mentioned to the defendant that the victim's diaper needed to be changed, and the defendant said that she would do so. However, after Holloway showered, he noticed that the defendant had not changed the victim's diaper. Holloway asked the defendant a second time to change the diaper, but the defendant did not respond. The defendant did tell Holloway that she would not be attending his graduation, and Holloway and the older children left the apartment at approximately 4:50 p.m. to drive to Mississippi Boulevard Christian Church where the ceremony was being held.

Once at the church, Holloway turned off his cellular telephone as requested by the instructors. The ceremony lasted approximately one hour, and afterwards, Holloway turned on his cellular telephone and discovered that he had received 10 messages from the defendant and a neighbor advising that the victim "had a accident" and was being taken to the hospital. Holloway contacted the defendant who explained that the victim had choked while being fed, that she rushed the victim to the hospital, and that the victim died at the hospital. Holloway drove to the hospital where he encountered the defendant and the defendant's family. Several days later, the defendant admitted to Holloway that she had struck the victim once in the stomach and once in the head because the victim "was hollering and wouldn't shut up."

Holloway related that earlier that same year in April, the victim had sustained a fractured skull and broken wrist. At the time of those injuries, Holloway was incarcerated, and the defendant told him that the injuries were caused when the defendant's 11-year-old sister dropped the infant.

At the time of trial, Holloway and the defendant were engaged to be married. On cross-examination, Holloway characterized the defendant as a "good mother."

Terri Frazier was sitting on her apartment porch visiting with her cousin on June 17, when at approximately 6:00 p.m., the defendant "came around the corner walking, . . . fidgeting with her hands." Frazier had never before met the defendant, but the defendant approached and asked to borrow a telephone. Frazier testified at trial that the defendant explained that she needed a telephone "to call her baby daddy cause her baby wasn't breathing." Frazier handed the defendant a telephone and advised her to first contact E 911. The defendant ignored the advice, and dialed and redialed a number without success. Frazier described the defendant as unemotional. Frazier's sister grabbed the telephone, dialed E 911, and handed the telephone back to the defendant. The defendant reported to E 911 that the victim had stopped breathing.

In an effort to assist, Frazier's cousin and the cousin's daughter asked the defendant where she lived. The defendant pointed toward the apartment, and the cousin and cousin's daughter ran and tried to get inside the apartment. The doors, however, were locked. Frazier stated that she and the defendant then walked to the apartment, and the defendant unlocked the door. The defendant said that the victim was upstairs, and Frazier and her relatives located the victim in the playpen. Frazier described the victim as "green and his stomach was swollen." Frazier's cousin picked up the victim and placed him on the bed. The woman "blew into his mouth[,] and he threw up a little bit[,] and she wiped the puke out of his mouth, and then she did it again." The paramedics arrived and began treating the victim.

Frazier's cousin, Tonni Burt, testified at trial and corroborated the events of June 17. Burt testified that while she was trying to resuscitate the victim, the defendant merely stood back without emotion. The paramedics were able to establish a heart beat in the victim, and they rushed the child to the ambulance. Burt heard her cousin tell the defendant to go with the paramedics to check on the victim. Burt never saw the defendant crying or displaying emotion.

Memphis Police homicide investigator Nathan Berryman interviewed the defendant on June 20, three days after the victim's death. After acknowledging and waiving her rights, the defendant was questioned at the police department homicide office. Investigator Berryman testified that initially the defendant denied any involvement in the victim's death but ultimately admitted punching the victim in the stomach and head. The defendant told him that she was upset because she did not have camera film to photograph Holloway's graduation. After Holloway left the apartment, the defendant removed the victim from the playpen intending to change the diaper, but when the victim began crying, she punched him in the head and stomach, placed him back in the playpen, and went downstairs.

At trial, Investigator Berryman identified a written, four-page statement that recounted the defendant's version of events. Investigator Berryman read the statement to the jury in which the defendant spoke of Holloway harassing her by his repeated requests for her to attend the graduation. The defendant said that Holloway's behavior made her "mad and upset," such that when the victim started crying, she hit the victim and placed him in the playpen face down. The defendant went downstairs and made a sandwich. Later, when she returned to the bedroom, she noticed that the victim was not breathing and had vomit on his face. She removed the victim from the playpen and

placed him on the bed. She tried shaking the victim, but he was unresponsive. The defendant moved the victim back to the playpen, and she found her keys and ran out the front door. She asked to borrow a telephone from "some ladies standing [nearby] on the porch." The defendant told the investigator that she placed a call to E 911.

The final part of the statement that Investigator Berryman read to the jury consisted of the following questions and answers:

QUESTION: Where did you hit the baby?

ANSWER: I hit him in the head once and in the stomach.

QUESTION: What part of the head did you hit him in?

ANSWER: The right side.

QUESTION: Did you hit him with anything?

ANSWER: I just hit him with my fist.

QUESTION: Was he lying on his back when you hit him?

ANSWER: Yes.

QUESTION: After you hit the baby while you were lying [sic] him down in the playpen, how was he acting?

ANSWER: He was sniffling.

QUESTION: Did the baby cry or make any other noise while you were downstairs?

ANSWER: No.

QUESTION: Had you ever struck the baby before in this manner?

ANSWER: No.

QUESTION: Have you ever seen Dewayne abuse the baby or any other children?

ANSWER: No.

QUESTION: Do you feel like you've been treated fairly during this interview?

ANSWER: Yes.

QUESTION: Did you give this statement freely and voluntarily without any threats, promises, or coercion?

ANSWER: Yes.

QUESTION: Is there anything else that you would like to add to your statement that would aid us in this investigation?

ANSWER: I'm sorry for what I did to my baby. I should have never hit him.

The State's final witness was Dr. Teresa Campbell who performed the autopsy on the victim. The autopsy revealed blunt trauma to the victim's head as evidenced by multiple head contusions of various ages and by skull fractures. Doctor Campbell testified that she found one recent skull fracture in the right back of the head and a healing skull fracture on the left side of the head. She also found a "very old skull fracture" on the right side of the head that was almost completely healed. The victim had a "recent left six rib fracture" and a fracture of the arm bone, and Dr. Campbell observed "[s]cattered scars to the chest and the arms and the legs."

Doctor Campbell identified the fatal injury as the blow on the right side of the head and behind the right ear. That injury fractured the skull resulting in brain swelling and difficulties with breathing and heart rate. In her opinion, the fatal fracture was consistent with a "blow with the fist to the back of [the victim's] head." On cross-examination, Dr. Campbell agreed that with a prior brain injury and then a second blow to the head, the brain "is more susceptible to being injured more severely if it's already injured." She also acknowledged the "possibility" that the victim could have survived the recent trauma in the absence of the earlier or older trauma.

At the conclusion of the State's case, the defense rested without offering additional proof. From the evidence elicited, the jury deliberated and found the defendant guilty of first degree felony murder in the perpetration of aggravated child abuse of a child six years of age or less and aggravated child abuse.

## I. Sufficiency of the Evidence

The defendant assails the evidence at trial as legally insufficient to support her first degree felony murder and aggravated child abuse convictions. We measure those contentions with a familiar legal yardstick. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the

vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979).

In determining sufficiency of the proof, the appellate court does not replay or reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

With these principles in mind, we turn to the specific conviction offenses.

First degree felony murder, as relevant here, is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." T.C.A. § 39-13-202(a)(2) (2003). For felony murder, "[n]o culpable mental state is required for conviction . . . except the intent to commit the enumerated offense[]." *Id.* §39-13-202(b). The offense of aggravated child abuse is defined as "child abuse" that "results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1) (2003). Child abuse, as relevant in the case, is defined as "knowingly, other than by accidental means, treat[ing] a child . . . in such a manner as to inflict injury." *Id.* § 39-15-401(a). Child abuse is graded according to the age of the child. For an abused child with serious bodily injury, such as in this case, who is six years of age or less, the penalty is a Class A felony. *Id.* § 39-15-402(b).

The defendant attacks her convictions on two grounds. First, she argues that the prosecution introduced no evidence to show that she understood that the risk of excessive swelling existed in light of the earlier injury to the victim when he was dropped by the defendant's sister. She interprets the evidence as showing that she acted out of "frustration" rather than an intent to cause serious bodily injury. Second, she maintains that the evidence is insufficient to establish beyond a reasonable doubt that the blow, which she inflicted to the infant's head, was "the actual cause of the swelling of the brain resulting in death."

In *State v. Ducker*, 27 S.W.3d 889 (Tenn. 2000), the Tennessee Supreme Court determined that

> the Tennessee child abuse and neglect statute is clear that "knowingly" modifies "treats" or "neglects." The actus reus is modified by the clause "other than by accidental means."

Accordingly, the statute requires that the act of treating a child in an abusive manner or neglecting the child must be knowing conduct.

*Id.* at 897. As a result, *Ducker* plainly declares that it is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant, in other words, need not know that his or her conduct will result in serious bodily injury. *See id.*

*Ducker* disposes of the defendant's argument that the evidence failed to show that she understood the risk of excessive swelling existed. The prosecution was not required to prove that the defendant knew that repeatedly striking the infant would result in serious bodily injury. Rather, the prosecution needed only to prove beyond a reasonable doubt that the defendant's treatment of the infant was knowing conduct. The evidence in this case amply supports that conclusion.

The defendant expressly admitted in her statement given to Investigator Berryman that she knowingly struck the infant because the infant would not cease crying. She stated, "By me already being mad and upset, I hit him. I got – he got to crying even louder and I hit him again in the stomach area." Furthermore, the evidence is uncontested that the infant was solely in the defendant's care when the injuries were inflicted and that when Holloway left to attend graduation, the infant was uninjured.

The defendant's argument that the evidence failed to show that striking the infant on the head was the actual cause of death is also unavailing. To be sure, Dr. Campbell catalogued several injuries of various ages to the infant's head. Doctor Campbell, however, was specific in her testimony that "the injury that killed the child was a blow to the head that caused a fracture to the bone in the head with resulting swelling of the brain. The swelling of the brain would have caused problems with breathing and his heart rate." From the record before us, we note that immediately after Dr. Campbell's statement, the trial court clarified, "For the record, she pointed to the back of the doctor's head on the right side behind the right ear." The defendant, in her statement to Investigator Berryman, identified the location where she struck the infant in the head as "[t]he right side." From this evidence, a rational jury could certainly conclude that the defendant struck the fatal blow to the right side of the infant's head.

In summary, viewing the evidence in a light most favorable to the prosecution, and leaving the resolution of any inconsistencies to the jury, we conclude that a rational trier of fact could conclude beyond a reasonable doubt that the defendant committed the offenses of first degree felony murder during the perpetration of aggravated child abuse and aggravated child abuse. The defendant, accordingly, is not entitled to relief on this issue.

## II. Sentencing

The defendant is aggrieved of the sentence imposed by the trial court for the aggravated child abuse conviction. The trial court found and applied one enhancement factor, that the defendant had abused a position of trust. *See* T.C.A. § 40-35-114(14) (Supp. 2005). The trial

court found no mitigation other than the relative youth of the defendant. Balancing the enhancement factor and the weak mitigation factor, the trial court imposed a Range I sentence of 20 years and six months. *See id*. § 40-35-112(a)(1) (2003) (Range I sentence for Class A felony is not less than 15 years nor more than 25 years).

On appeal, the defendant complains that the trial court placed too much weight on the enhancement factor and failed to assign proper weight to the defendant's relative youth. She also argues that the trial court erroneously failed to acknowledge her admitted remorse.

When there is a challenge to the manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The sentencing court must consider (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b) & -35-103(5) (2003).

The defendant in this case has not carried her burden of showing that her sentence is improper. First, the weight to be given to any individual enhancement or mitigating factor is within the sound discretion of the sentencing court. *State v. Alder*, 71 S.W.3d 299, 306 (Tenn. Crim. App. 2001); *State v. Hayes*, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995). The defendant does not point out how or why the trial court abused its discretion in assigning substantial weight to the enhancement factor of abuse of position of trust. Likewise, the defendant does not explain why her age, which was 18-years old at the time of the offense, is entitled to or commands significant mitigation weight.

Second, we are unable to assess the defendant's claim that the trial court failed to consider her admitted remorse. The record before us does not contain the presentence investigation report, and the sentencing hearing itself was rather brief. The only reference to remorse that we have discovered is attributable to the prosecution at sentencing when it noted that despite the overwhelming evidence at trial and the defendant's confession to law enforcement officers, the

defendant "told Pre-Sentence people that she's done nothing wrong."  The trial court then commented that it did not find that the defendant was remorseful.

It is the appellant's duty to include those materials in the appellate record which are necessary to convey a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal.  *See* Tenn. R. App. P. 24; *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998).  The presentence report is evidence which is considered by the trial court and therefore is necessary to convey a fair, accurate, and complete account of the proceedings below.  *See* T.C.A. § 40-35-210(b) (2003).  In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence.  *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE