IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2007

ROY R. WILLIAMS v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. P-27513     Joseph B. Dailey, Judge

No. W2006-02128-CCA-R3-PC  - Filed September 7, 2007

The Petitioner, Roy R. Williams, appeals the post-conviction court's order dismissing his petition for post-conviction relief.  The Petitioner argues that his conviction for murder during the perpetration of a felony should be set aside because his trial attorneys failed to properly investigate a possible insanity defense and because they coerced him to plead guilty by making him fearful of receiving the death penalty.  Following our review, we affirm the post-conviction court's order of dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Britton J. Allan, Memphis, Tennessee, for the appellant, Roy R. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Nicole Germane, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

FACTS

Pursuant to a plea agreement, the Petitioner pled guilty in August of 2002 to one count of murder during the perpetration of a felony (aggravated robbery).  He was sentenced to life without the possibility of parole.  According to the Petitioner's appellate brief,[1] the State detailed the

---

[1] Because the record on appeal does not include a transcript of the Petitioner's guilty plea submission hearing, we can only rely on the parties' briefs and the testimony presented at the post-conviction hearing to set out a factual background for the Petitioner's underlying crime.

following factual background of the Petitioner's underlying crime at his guilty plea submission hearing:

[T]he facts which gave rise to the indictment occurred when the victim in this case, Ms. Annabell Muldrow[,] was killed [sic] early morning hours of April 29th of the year 2000. She lived at a location in Whitehaven and was employed by Federal Express.

She had come home from work early that morning and her body was discovered at a later time. When the police officers were investigating the case[,] they received word that [the Petitioner] was someone who frequented the neighborhood and perhaps lived across the street. They also found that [the Petitioner] had been stopped by a highway [p]atrolman in the State of Missouri shortly after the murder driving the victim's car.

They did not detain him because they did not know they had a murder suspect at the time the ticket was given. At a later time, he was arrested, [and] he gave incriminating statements wherein he stated that he was present and did not participate in the murder but did participate in a robbery.

He—DNA—samples were taken and these samples were compared with the sample—with samples that were taken from the victim, and the results of those tests were positive. And we feel we could prove that [the Petitioner] did have sex with the victim against her will, and that not only did he rob her[,] but he also raped her.

Subsequent indictments were submitted based on those facts. The [Petitioner] was also found in the custody of the victim's automobile. He also had her credit cards[;] he used them extensively.

If this case went to trial, . . . we feel that through statements of admissions by the [Petitioner] and through the physical evidence that there would be no doubt of the [Petitioner's] guilt.

Also, . . . as late as—I believe it was last week or perhaps two weeks ago . . . . [the Petitioner called a police officer] and [told him] that he wasn't the only one involved in killing her, that there was someone else.

That someone else. . . has been eliminated as a suspect. We knew about that months ago during the initial investigation of the case that person was contacted and he was eliminated as a suspect.

The trial court accepted the guilty plea and entered a judgment of conviction for first degree murder. Pursuant to the plea agreement, the Petitioner was sentenced to life without parole.

The Petitioner subsequently filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel, and an amended petition was filed in which the Petitioner asserted that his two trial attorneys did not provide the effective assistance of counsel guaranteed by the United States and Tennessee constitutions for six reasons: (1) they failed to conduct an adequate investigation of his medical and mental health history; (2) they failed to investigate the effect being raped as a child on numerous occasions had on the Petitioner; (3) they did not confer with or visit

-2-

with the Petitioner for months at a time; (4) they coerced him to plead guilty; (5) they "enlisted" his mother to force him to plead guilty; and (6) they did not adequately prepare for trial.

The post-conviction court held an initial evidentiary hearing at which the Petitioner and both of his trial attorneys testified. For clarity, we will refer to his attorneys as "lead defense counsel" and "second defense counsel."

Lead defense counsel testified that, prior to representing the Petitioner, she had practiced criminal law for about fifteen years and that she had represented "quite a few" defendants in death penalty cases. Subsequent to her representation of the Petitioner, she became a Tennessee criminal court judge. In the Petitioner's case, she requested that the general sessions court appoint second defense counsel and "a group of investigators" to assist her with his defense. The appointed defense team also included a mitigation specialist and a jury consultant.

Asked whether she had conducted an inquiry into the Petitioner's mental health history, lead defense counsel explained that they had "immediately started looking into his background knowing that this would be a death-penalty case because the facts were so horrible." She discovered that the Petitioner had exhibited "difficult behavior" from an early age and had a poor disciplinary record in school. When he was in elementary school, his discipline problems were serious enough that he was hospitalized at St. Joseph's Hospital for thirty days, "where he was treated for mental-health issues." In addition to investigating the Petitioner's troubled background and obtaining relevant records, lead defense counsel also had a psychologist evaluate him.

The results of his psychological evaluation showed that he was competent to stand trial and that he was not insane. The Petitioner's problems did not "rise to any level that could be used to assist with a diminished capacity or insanity" defense. According to lead defense counsel, he just "had a lot of emotional issues. He had this kind of rage problem, . . . he was always getting into fights . . . [and he] would just fly off the handle at the slightest thing." She said that the Petitioner's mental health problems could have been used for mitigation purposes, but they did not "think it was very sympathetic, and it probably would have frightened the jurors."

On cross-examination, lead defense counsel affirmed the information contained in the psychologist's affidavit, which stated as follows:

> This is a complex case with multiple medical issues including potential brain injury. Possible substance use by the mother during her pregnancy with [the Petitioner]; childhood traumas of sexual abuse and physical abuse; a long history of emotional problems; and a long history of mental impairments.
>> It will be necessary to have [the Petitioner] evaluated by a medical doctor in order to better determine the role of the various medical factors in this case.

The report further recommended that "medical imaging" of the Petitioner's brain be conducted and that the Petitioner be examined by a "neuro psychiatrist." Lead defense counsel confirmed that

further medical examination was not pursued but explained that his mental health "really had nothing to do with guilt or innocence. He wasn't insane. He was competent." She also stated that if the Petitioner had insisted on going to trial, "we certainly would have sought those services."

Lead defense counsel testified that she, second defense counsel, and a mitigation specialist all "spent a lot of time" with the Petitioner and knew about the alleged incidents of sexual abuse that occurred during his childhood. Specifically, she stated that she was aware of two incidents—a cousin had "touched him" while babysitting for him and he had done "something" to a younger cousin himself.

Lead defense counsel denied that she and second defense counsel did not visit the Petitioner in jail for months at a time and, by reviewing her notes, recounted nineteen specific dates she had visited the Petitioner either in jail or in court over a period of thirteen months. Additionally, she stated that her visits with the Petitioner were lengthy and that she also frequently spoke with him on the telephone. At most of her meetings, she was accompanied by their investigator, the mitigation specialist, or second defense counsel. She said, "usually it was me and one other person just because it was a little difficult to get through to [the Petitioner]. We had to repeat ourselves because he would always just come back to the same things; that he wasn't the only one who did this and other people needed to be arrested and prosecuted for it."

Lead defense counsel testified that she wanted the Petitioner to plead guilty "from Day 1." She explained that he had confessed, and there were several reasons why she did not think a jury would have any sympathy for him:

> According to [the Petitioner], he and two other people walked over to [the victim's] house when she had just gotten home and opened up her vehicle to get out of the car; and supposedly this other person, Thomas Jackson, came up and asked to use her phone, and she said okay and let him in the house. And Thomas Jackson supposedly then just started, you know, beating her and choking her, and that [the Petitioner] had done—she grabbed a barbell to defend herself, and [the Petitioner] took that barbell away from her; and, you know, it went from there, and she ended up, you know, being beaten with the barbell and taken into a back area and killed and left in her bedroom, you know, wrapped up in her bed sheets and all kinds of things and that he didn't do any of this stuff. He just took the barbell away, and he stayed there and ended up driving her vehicle up to St. Louis where his mother lived.
>
> But once the investigation was completed, only [the Petitioner's] footprints were found, you know, through the house. His semen was found in her—you know, DNA connected him with her rape. And, you know, every time all of this evidence was presented to him, his story would change.
>
> But he always insisted that this Thomas Jackson and some junkie named, I think, Squeaky, were there also; and he wanted them prosecuted; and he could never let that go.
>      . . . .

-4-

He had [also] done things like written a letter to the detective in charge that, you know, while we were representing him, that, "I'll tell you what you want to know if you'll just give me two hours—a couple of hours alone with my girlfriend." You know, he just kept doing things that would hurt him, you know, in front of a jury. I'm sure [the State] would have presented that letter [at trial]. Just no remorse at all. It was just a bad case, and we really wanted him to plead guilty, yes.

When asked if she ever considered moving to have the Petitioner's confession suppressed, lead defense counsel stated that she "couldn't get him to stop talking about it. Like I said, he wrote a letter to the detective—I mean, he was writing letters to the victims. He—[the Petitioner] never denied being there on the scene of this crime."

Lead defense counsel testified that the defense team talked to the Petitioner's mother about his case. They showed her the evidence against him and explained to her the likelihood that he would receive the death penalty if he went to trial. She understood and did not want her son to be executed, and "she helped to talk to him about it."

Lead defense counsel denied that they ever threatened him to get him to plead guilty, and said that the Petitioner understood that they were trying to help him avoid the death penalty. According to lead defense counsel, "[h]e just didn't like the options that he had." However, she affirmed that, when he finally decided to plead guilty, he understood that it was in his best interest. She also testified that she would have been prepared had the Petitioner decided to go to trial but said she "really [did not] think the outcome would have been good," which was why she wanted him to plead guilty.

Second defense counsel testified that he had represented many defendants accused of murder and "less than ten but almost ten" were death penalty cases. In the Petitioner's case, he said that defense investigators "gathered extensive records" relating to his medical history. He stated that their investigation of his mental health was not completed before he pled guilty, but he repeatedly testified that there was no question about the Petitioner's competency or the fact that they would not be able to advance an insanity defense if he decided to go to trial. They had a defense theory regarding his mental health, but it could have only been used as "a mitigation theory," not an absolute defense. However, second defense counsel said that "we were uncertain of whether it would be enough—whether [the jury] would embrace it as a reason not to send him to death row." The defense team was worried that the jury might agree that the Petitioner was a person "afflicted with some mental-health issues" and still impose the death penalty.

Regarding the Petitioner's mother, second defense counsel agreed that they did "enlist" her to help him decide to plead guilty because "[h]e trusted her," and "[h]e did rely on her very heavily in making decisions." He said that they also consulted the Petitioner's step-father and "that he was very helpful as well."

Second defense counsel further testified that he believed that the Petitioner pled guilty of his own volition and that they did not coerce him. About two weeks passed between the time the Petitioner first said he wanted to plead guilty and the time he actually entered his plea, and second defense counsel spent "some time" with him during that period. He said, "I believe he understood it. And I don't think he was happy about his choices, but there weren't any good ones."

Second defense counsel affirmed that he and lead defense counsel discussed the housing conditions of "death row" with the Petitioner but said that they did not tell him a "ghost story to try and scare him about death row. We were concerned that the State of Tennessee would put him to death if he proceeded, even with our theory, at trial, and made no bones about that . . . that's what we thought would happen if he went to trial."

The Petitioner testified that lead defense counsel forced him to plead guilty. Asked how she forced him, he said,

> [b]y constantly telling me I was going to get the death penalty, and constantly pressuring me, saying by this my [sic] first time being locked up, she was steady saying how death row is and [Riverbend Maximum Security Institution in] Nashville, how it is—and saying—just constantly throwing stuff at me like coming to see me and trying to give me candy in envelopes to keep me calm.

He confirmed that part of the reason he pled guilty was because he was scared of what he was being told.

The Petitioner said that his mother told him that whether to plead guilty was his decision and that he should go to trial if he was innocent but, at some point, she started encouraging him to plead guilty. However, when asked if he pled guilty because his mother told him to, he said, "[n]o, not really."

He acknowledged that the transcript of his guilty plea submission hearing showed that, when he pled guilty, he thought that his attorneys had given him "the best advice" they could and that he was "fine" with the way they represented him. However, he explained that he was listening to the judge at that hearing, but he "wasn't really paying attention." According to the Petitioner, his attorneys made him feel like he had no choice but to plead guilty, forcing him to do so by telling him that he was going to get the death penalty if he went to trial.

At a subsequent hearing, the Petitioner's mother testified that, before the Petitioner pled guilty, she met with lead defense counsel who told her that she wanted him to plead guilty "so he wouldn't get the death penalty." Lead defense counsel knew how important the Petitioner's mother was to him and that she had significant influence over him. The Petitioner's mother affirmed that lead defense counsel told her that the only way the Petitioner could avoid the death penalty was by pleading guilty. However, his mother also testified that she would have told the Petitioner to plead guilty even if lead defense counsel had not told her to tell him that.

The Petitioner's mother discussed his mental health issues with second defense counsel, and she told him that the Petitioner had experienced "anger problems" since he was in pre-school. She sent second defense counsel the Petitioner's medical records from a "behavior clinic" that treated the Petitioner.

The post-conviction court took the matter under advisement and subsequently issued a written order denying relief, including findings that the Petitioner's trial attorneys did an outstanding and thorough job in representing the Petitioner:

> . . . From the testimony of [lead defense counsel] and [second defense counsel] and from the records contained in the [c]ourt's file, it is apparent that none of [the Petitioner's] complaints [are] well-founded. [Lead defense counsel] and [second defense counsel] explained for the record that while they were ready for trial and would have certainly represented their client zealously at trial if that had been necessary, the proof in the case was so overwhelming and the facts were so egregious that their primary focus was to keep their client off of death row. They explained all of this to their client on numerous occasions and did in fact enlist the aid of the [Petitioner's] mother in an attempt to convince him that pleading guilty was in his best interests. It was apparent from the transcript of the guilty plea hearing that [the Petitioner] entered his plea freely and voluntarily and was not coerced in any way to do so.
>
> With regard to the investigation of the case it is equally apparent that the defense lawyers conducted an extremely thorough investigation. In fact, in this case [lead defense counsel] convinced the general sessions judge to approve funding for an investigative staff so that the work could begin early on. [The investigators] investigated the matter thoroughly and [lead defense counsel] and [second defense counsel] met on numerous occasions with their client in the jail to discuss the results of their investigation. Likewise mental health professionals were consulted and the entire issue surrounding [the Petitioner's] mental history was explored. A review of the record would suggest to this [c]ourt that [lead defense counsel] and [second defense counsel] did an outstanding and extremely thorough job in representing the [Petitioner] in this matter. Any allegation to the contrary is without merit. They clearly met the standards set fort in Baxter v. Rose, 523 S.W.2d 930 ([Tenn.] 197[5]), and subsequent cases.

This appeal followed.


## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred by denying relief. Specifically, he asserts that his and his mother's testimony at the post-conviction hearing "establish a pattern of coercion that rendered his guilty plea involuntary." He also maintains that his trial attorneys' performances were deficient because they "did not conduct a reasonable investigation for

an insanity defense prior to trial." As such, he contends that "[t]he cumulative effect of all the aforementioned errors resulted in prejudicial error," and therefore, the judgment of the post-conviction court should be reversed and his case remanded for a new trial.

I. Voluntariness of Petitioner's guilty plea

Initially, we note that the Petitioner bears the burden of preparing a record "that presents a complete and accurate account of what transpired in the trial court with respect to the issue on appeal. The failure to do so results in a waiver of such issues and a presumption that the ruling of the trial court was correct." State v. Thompson, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997) (citing Tenn. R. App. P. 24(b); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); State v. Draper, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990)). In this case, the Petitioner has failed to include a transcript of his guilty plea submission hearing in the record before this Court. As such, we are unable to conduct a complete review of his argument that his plea was coerced, and the issue could thus be treated as waived. See id. Nonetheless, based on the evidence presented at the post-conviction hearing, we will address this issue on the merits.

When a guilty plea is entered, a defendant waives certain constitutional rights, including the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront witnesses. Boykin v. Alabama, 395 U.S. 238, 243 (1969). "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." Id. at 242. Thus, in order to pass constitutional muster, a guilty plea must be voluntarily, understandingly, and intelligently entered. See id. at 243 n.5; Brady v. United States, 397 U.S. 742, 747 n.4 (1970).

We disagree with the Petitioner's claim that his testimony and his mother's testimony "establish a pattern of coercion that rendered his guilty plea involuntary." The referenced testimony shows that both attorneys adamantly advised the Petitioner and his mother that, due to the nature of the offense and the strength of the State's case against him, his best chance to avoid the death penalty was to plead guilty. The testimony presented at the hearings also establishes that the defense lawyers hoped the Petitioner's mother would be able to help influence him to plead guilty and that he eventually decided to plead guilty because he was afraid he would receive the death penalty if he proceeded to trial.

This evidence does not invalidate his guilty plea because "[t]he entry of a plea of guilty to avoid a death sentence or risk of greater punishment does not, standing alone, make a plea involuntary." Parham v. State, 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994) (citing Capri Adult Cinema v. State, 537 S.W.2d 896, 898 (Tenn. 1976) (other citations omitted); see also Brady v. United States, 397 U.S.742, 748–50 (1970); William Berrios v. State, No. E2003-01791-CCA-R3-PC, 2004 WL 962840, at *4 (Tenn. Crim. App., Knoxville, May 5, 2004) (stating that "[a] guilty plea is not involuntary simply because the accused was faced with an election between a possible death sentence upon trial and a lesser sentence upon a guilty plea"). In the Petitioner's case, deciding to plead guilty to avoid the risk of being sentenced to death was a reasonable choice, and the record

does not support his contention that it was made involuntarily. He has also failed to show that his attorneys performed deficiently by counseling him to plead guilty. This issue has no merit.

II. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether

counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

On appeal, the Petitioner argues that his trial attorneys' performances were deficient because they did not "conduct a reasonable investigation for an insanity defense prior to trial." More specifically, he claims that his attorneys' performances were deficient because further medical testing was not pursued after the psychologist who evaluated the Petitioner "repeatedly requested additional medical testing of the [Petitioner] due to the severity of his mental condition and the possibility of an organic brain dysfunction that would only be diagnosed through medical imaging."

We need not address the Petitioner's argument regarding deficient performance because, as stated above, in order to prevail on an ineffective assistance of counsel claim, the Petitioner must not only show through clear and convincing evidence that his attorneys' performances were deficient, but also that the deficient performances resulted in prejudice. See Burns, 6 S.W.3d at 461. Despite making the above argument regarding deficient performance, the Petitioner did not present any evidence that an insanity defense could have been supported or that he would not have pled guilty if further medical examination had been conducted. Accordingly, he has failed to show that he was prejudiced by his attorneys' allegedly deficient performances and cannot prevail on his ineffective assistance of counsel claim. Id. This issue is without merit.

Lastly, the Petitioner asserts that "the cumulative effect of all the aforementioned errors resulted in prejudicial error . . . ." Again, we disagree. The record supports the post-conviction court's findings that the Petitioner voluntarily pled guilty and that his attorneys were not constitutionally ineffective.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the post-conviction court's order dismissing the Petitioner's petition for post-conviction relief.

_____
DAVID H. WELLES, JUDGE