# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 26, 2010

## STATE OF TENNESSEE v. JUNIOR P. SAMUEL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-A-240     Steve R. Dozier, Judge**

---

### No. M2009-01192-CCA-R3-CD - Filed June 7, 2011

---

A Davidson County Criminal Court Jury found the appellant, Junior P. Samuel, guilty of five counts of rape and one count of sexual battery by an authority figure. The trial court imposed a total effective sentence of thirty-two years in the Tennessee Department of Correction. On appeal, the appellant raises the following issues for review: (1) whether the trial court erred in denying the appellant's motion for judgments of acquittal because of the State's failure to establish venue; (2) whether the trial court erred in admitting a medical report containing statements the victim made to Phyllis Lynn Thompson in violation of the Confrontation Clause and the rule prohibiting hearsay statements; (3) whether the trial court erred in imposing consecutive sentencing; and (4) whether the cumulative errors at trial denied the appellant due process. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Dan R. Alexander, Nashville, Tennessee, for the appellant, Junior P. Samuel.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Katrin Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Davidson County Grand Jury returned a multi-count indictment charging the appellant with twenty-one sexual offenses against his minor stepdaughter, including rape, sexual battery by an authority figure, especially aggravated exploitation of a minor, and rape of a child. Prior to trial, eight of these counts were dismissed, and the appellant was tried on eight counts of rape, three counts of sexual battery by an authority figure, one count of especially aggravated sexual exploitation of a minor, and one count of rape of a child. At the conclusion of the trial, the jury found the appellant guilty of five counts of rape and one count of sexual battery by an authority figure but found him not guilty of the remaining charges.

Geneva Thomas, a family service worker for the Department of Children's Services (DCS), testified that on May 4, 2006, her office received a complaint about the suspected sexual abuse of the victim. The complaint required immediate attention because the alleged perpetrator lived in the victim's home. Therefore, within two hours of the complaint Thomas and police officers went to the victim's home on Nolensville Road in Davidson County.

Thomas said that when they arrived, only the fourteen-year-old victim and her younger brother were at home. Thomas called the victim's mother at her workplace and asked her to come home. While waiting for the victim's mother to arrive at the residence, Thomas interviewed the victim. Detective Gerald McShepard was also present during the interview, but he asked no questions. The interview lasted forty or forty-five minutes.

After the victim's mother came home, the victim asked Thomas to explain to her mother why the police were there. Upon hearing the explanation, the victim's mother became very upset and started crying. Thomas comforted the victim's mother, then Thomas and Detective McShepard followed her to Nashville General Hospital where she took the victim for an examination. Thomas said she next spoke with the victim and her mother on May 10, 2006, but she had not spoken with them since that day.

Phyllis Lynn Thompson, a social worker, testified that in May 2006 she was employed by Our Kids Center. She explained that Our Kids Center was responsible for evaluating children who have been referred to the center because of concerns of sexual abuse. She said that when the report of sexual abuse alleges "sexual contact that could lead to infection[,] pregnancy, [or] injury," then, within seventy-two hours, the child is seen at the emergency room of Nashville General Hospital.

Thompson said that when the child is seen in the emergency room, the protocol used by Our Kids Center is to have "a team, where there's a mental-health role and a medical-provider role, so that we can . . . use our expertise in our different areas, to attend to whatever the situation is going on at the time." She said that in her role as a "mental-health-care provider," she goes to the hospital to take a "medical history" of the victim. Thomas

explained that the center has developed a protocol "in which there is a stage for rapport-building and assessing the child's developmental level . . . . And then there is a process of basically doing a review of history." She said that "the next component is that we would elicit any concerns, if there is any sexual abuse that they talk about, for purposes of medical diagnosis and treatment." She stated that "finally, we would prepare the child for the exam." Thompson said that after she obtains the medical history from the child, she then relays the history to the medical care provider who conducts the physical examination.

In the instant case, Thompson went to the emergency room on May 4, 2006, to speak with the victim after receiving the referral from DCS. She explained to the victim what would occur during the examination and told her that her answers to Thompson's questions would be used to determine the course of the physical examination, including the tests to be conducted and the nature of her treatment. For example, Thompson explained to the victim that the medical provider would use a "colposcope [which] is a . . . light source that sits on a stand and [is] used to check the genital and anal area." Thompson also explained to the victim that a camera was attached to the colposcope but that photographs would be taken of only "internal structures." Thompson stated that she informed the victim that they would swab her with a Q-tip "and that . . . where she was touched with Q-tips was depending on what she had said during the interview; that we would be checking for different kinds of infection." Thompson said the victim appeared to understand.

Thompson said she made a report which included the victim's answers during the interview. Thompson recalled that the victim denied having any physical complaints, such as pain, trouble with urination, or problems breathing or sleeping. When Thompson asked the victim if she had done anything to hurt herself, "she described how she has grabbed, pulled and dug her fingernails into her legs and stomach." The victim stated that she last hurt herself "[l]ast year." The victim said she had no thoughts of suicide.

The victim stated that she had no history of consensual sexual activity. Thompson asked the victim why she was at the hospital, and the victim replied, "I was raped." The victim said her father, the appellant, had touched her breasts and her vagina with his hands, both over and under her clothes. She also stated that the appellant touched the inside and outside of her vagina with his hands. The victim maintained that the last time the appellant touched her breasts and vagina was the day before the exam.

During the interview, the victim said that the appellant "performed oral sex on me . . . [meaning that he] 'put his tongue in my vagina.'" She said the appellant performed cunnilingus on her once when she was twelve, once when she was thirteen, and the last time was the previous day. The victim also told Thompson that the appellant had made her fellate him, with the first time being when she was thirteen years old and the last time being the previous day. The victim stated that she had seen the appellant ejaculate but that the

-3-

ejaculate never touched her mouth. She explained that the appellant "wiped it off with a tissue and threw the tissue in the trash."

The victim said that the appellant had penetrated her vagina with his penis. She said that he "always pulls it out" and that he had ejaculated on her stomach when she was fourteen years old. She said the first instance of intercourse occurred when she was twelve and that the last instance occurred when she was fourteen. She stated that after the penetration her vagina was swollen, but she had no pain or bleeding. The victim said the appellant kept a "condom that was wrapped in a gold packet in his drawer."

When asked if any other type of touching took place, the victim said the appellant made her rub his penis on more than one occasion, the last time being the previous day. Thompson asked the victim if the appellant had ever taken any inappropriate pictures of her. The victim stated that when she was fourteen years old, the appellant twice used his cellular telephone to take pictures of her vagina but that he later deleted the pictures. The victim told Thompson that the appellant "told her not to say anything[] when the touching first began." At the conclusion of the interview, Thompson conveyed the information obtained from the victim to Julie Rosof-Williams, the nurse practitioner who performed the victim's physical examination.

Sue Ross testified that both she and Rosof-Williams were pediatric nurse practitioners at Our Kids Center. Ross stated that the nurse practitioners and doctors who examine children after allegations of sexual abuse rely heavily upon the medical history obtained by social workers like Thompson. She explained that the information regarding the type(s) of sexual contact endured by the victim helped the medical care provider determine the tests to be performed and the necessary extent of the "invasive[ness]" of the physical examination.

Ross stated that at the time of trial, Rosof-Williams was on an extended, out-of-the-country vacation. However, Ross testified regarding the medical report which documented the physical findings of the examination. The report stated that the "examination neither rules in nor rules out the possibility of sexual contact." The report reflected no physical findings to suggest sexual abuse. However, Ross explained that a lack of physical findings is typical.

Detective Gerald McShepard of the Metropolitan Police Department testified that on May 4, 2006, he accompanied Thomas to the victim's residence on Nolensville Road. Detective McShepard said that Thomas interviewed the victim at the residence, then the victim's mother took the victim to the hospital for an examination. Detective McShepard stated that even though a "rape kit" was performed, "nothing of evidentiary value [was] recovered."

-4-

Detective McShepard testified that, at his request, in the late night hours of May 4, 2006, the victim's mother made a "controlled phone call" to the appellant which police recorded. The recording was played for the jury. The recording reflected that the victim's mother told the appellant that he should know why she had taken the children and left home and that he knew how she felt about child molesters and sex offenders. The appellant responded that he did know and that he was sorry. He accused the victim's mother of "doing this" to "get back at [him]." The victim's mother responded that she was not being vindictive but that she was upset because the appellant had taken the victim's virginity. After much cursing and sobbing, the appellant acknowledged he had taken the victim's virginity. He told the victim's mother that an "evil . . . took over" him. The appellant told the victim's mother that he was molested in the past and could not believe he had done that to someone else.

On the recording, the appellant said, "I try to stay away from the house as much as possible so I don't do this." The victim's mother scolded the appellant, saying the victim found "peace" only when she went away for the summer. The victim's mother asked the appellant how he could have his "daughter," the victim, perform oral sex on him and how he could perform oral sex on the victim. The appellant said that it seemed like he was not the person who did those acts and acknowledged that he needed "help." The victim's mother accused the appellant of waiting for the victim to come home from school so he would have an opportunity to molest her. The appellant said that was not the way it was "all the time."

The appellant repeatedly asked the victim's mother not to report the abuse, offering to "pay [her] for the rest of [his] life." He said that the accusations would ruin his life, that he could not cope with going to jail, and that he would never be able to get a good job.

During the call, the victim's mother asked the appellant how many times he "had sex" with the victim, and the appellant replied, "Three or four times." The victim's mother said she found it improbable that only three or four instances of sex had occurred during the "two years" since the appellant began molesting the victim. The appellant replied that he did not always have "sex" with the victim and that often only "touching" was involved. He told the victim's mother that she did not need to take the victim for an examination because the victim had no diseases and because he had worn a condom to prevent pregnancy. The appellant also said that he usually left the house after the incidents.

Detective McShepard testified that later in the day on May 5, 2006, he and Detective Anthony McClain recorded an interview with the appellant at the home of the appellant's girlfriend. The recording was played for the jury. During the interview, the appellant acknowledged that he "molested" the victim. He said, "This is not me," maintaining that his actions were out of character. He said that he had never molested anyone but the victim. He stated that when the victim was twelve years old, he started talking to her about sex and

"introduced her" to sex. He said he "got carried away" and started touching the victim. He acknowledged that he touched her vagina with his fingers, alleging that he inserted just the "tip end" of his finger into her vagina. He told police that he had intercourse with the victim three times but maintained that most of the time he only "touch[ed]" the victim. He admitted that he made the victim perform oral sex on him on May 3, 2006, "at the house" on Nolensville Road. The appellant stated that he knew his actions were "evil" and that "nobody deserves this." He told police that he was willing to get counseling.

Thomas E. Newman, a court officer responsible for issuing subpoenas, testified that although the State's subpoenas to the victim and her mother were issued in late February, the State was unable to deliver the subpoenas. Newman noted that the Nolensville Road address the victim's mother had given the State was "bad." However, on the morning of trial defense counsel served subpoenas on the victim and her mother when they unexpectedly came to court.

Jill Howlett, the victim-witness coordinator for the District Attorney General's Office, testified that prior to trial the State asked her to help locate the victim and her mother so subpoenas could be served. The subpoenas were sent to their last known address, which was on Nolensville Road, but the subpoenas were returned as "undeliverable." Howlett also stated that the victim had been removed from school and that no forwarding address had been given to the school. Howlett said that despite numerous telephone calls and letters sent by the State, the victim and her mother were "unresponsive" and had not been heard from since a couple of days after the initial allegations were made. Howlett did not expect to see the victim or her mother in court. However, Howlett said that the victim and her mother "walked in here this morning with a subpoena." The victim's mother told Howlett that the appellant told her to come to court on the day of trial.

The trial court imposed ten-year, concurrent sentences for the rape convictions in counts one, two, and three and imposed a concurrent sentence of four years for the sexual battery by an authority conviction in count nine. On counts four and eight, the trial court sentenced the appellant to eleven years for each rape conviction. The trial court ordered the appellant to serve his sentence for counts one, four, and eight consecutively to each other for a total effective sentence of thirty-two years.

On appeal, the appellant raises the following issues for review: (1) whether the trial court erred in denying the appellant's motion for judgments of acquittal because of the State's failure to establish venue; (2) whether the trial court erred in admitting a medical report containing statements the victim made to Thompson in violation of the Confrontation Clause and the rule prohibiting hearsay statements; (3) whether the trial court erred in imposing consecutive sentencing; and (4) whether the cumulative errors at trial denied the appellant due process.

## II. Analysis

### A. Venue

The appellant argues that the State failed to prove venue. Article I, section 9 of the Tennessee Constitution provides that in all criminal prosecutions by indictment or presentment, the accused has a right to a speedy, public trial by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18. Proof of venue is necessary to establish the court's jurisdiction. See Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964). However, because venue is not an element of the offense, the State need only prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. See Tenn. Code Ann. § 39-11-201(e); State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). Venue may be proved by circumstantial evidence, and even slight evidence is sufficient if it is uncontradicted. State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

At trial, DCS employee Geneva Thomas testified that she interviewed the victim at the residence on Nolensville Road in Davidson County where the victim lived with her mother, her younger brother, and the appellant. During the "controlled phone call" between the victim's mother and the appellant, the appellant said that he tried to stay away from home so that he would not further molest the victim. He also stated that he would often leave home after molesting the victim. The victim's mother accused the appellant of lying in wait for the victim when she came home from school, and the appellant responded that was not always the case. We conclude that the foregoing evidence sufficiently ties the appellant's abuse of the victim to the home on Nolensville Road, which Thomas testified was in Davidson County. Accordingly, because the State sufficiently adduced proof of venue, the appellant is not entitled to relief on this issue.

### B. Victim's Statements

Next, the appellant argues that the trial court erred by admitting the victim's statements to Thompson which were recorded in the medical report. He contends that the statements were testimonial in nature, were not taken for the purpose of medical diagnosis or treatment, and, therefore, were inadmissible. He also contends that "the documents . . . which the statements were [in] contained hearsay and hearsay within hearsay."

Initially, we note that the technical record contains an order which was filed June 8, 2009, in which defense counsel noted that the testimony "of the State's witnesses given July 7th, 8th and 9th 2008 . . . were prepared and transcribed." The order reflected that defense

counsel "has ordered [transcribed] the remainder of the transcript not previously prepared and set forth above from the court reporter." The trial transcript in the appellate record does not contain a copy of the defense's proof; the transcript proceeds directly from the close of the State's proof to closing arguments. However, both the trial court's sentencing order and its order denying the motion for new trial refer to the trial testimony of defense witnesses, namely the victim and the victim's mother.[1] Moreover, the trial court noted that the jury obviously did not believe their testimony and that the court likewise found them not to be credible. Despite ample opportunity to ensure that the record was complete, the appellant failed to ensure that a transcription of the testimony of the victim and the victim's mother was included in the record for our review.

Because the testimony of the victim and the victim's mother are essential to deciding the Confrontation Clause issue, and, ultimately, the admissibility of the reports, we are constrained to conclude that the record is inadequate for our review. The appellant bears the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, we must conclude that the trial court's ruling regarding the admissibility of the medical report was correct.

## C. Sentencing

The appellant also contends the trial court erred by imposing consecutive sentencing. Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial

---

[1] Neither the appellant nor the State note the absence of the testimony of the victim and the victim's mother. Indeed, the issues are addressed as if neither witness testified at trial.

court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The trial court imposed sentences of ten years for each rape conviction in counts one, two, and three and four years for the conviction for sexual battery by an authority figure in count nine. The trial court ordered the sentences in counts one, two, three, and nine to be served concurrently with each other. For each rape conviction in counts four and eight, the trial court sentenced the appellant to eleven years. The court ordered the appellant to serve the sentences for counts one, four, and eight consecutively to each other for a total effective sentence of thirty-two years.

The appellant argues that the "trial court inappropriate[ly] . . . considered and cited the fact that the [appellant] introduced testimony and writing of the alleged victim claiming she made the whole thing up as a factor to be considered in his sentencing." The record reflects that a sentencing hearing was held on August 8, 2008, during which the State and the appellant submitted proof. The trial court's sentencing order reflects that because the appellant "requested consideration of alternative sentencing . . . the Court held the matter under advisement until the psychosexual assessment was completed." Thereafter, on February 20, 2009, a brief hearing was held, during which the appellant submitted a report about his psychosexual evaluation.

The appellate record does not contain a transcript of the August 8, 2008, sentencing hearing but does contain a transcript of the February 20, 2009, hearing. As we previously stated, defense counsel requested transcription "of the additional parts of the trial transcript not previously prepared." However, the State pointed out in its appellate brief that the transcript of the sentencing hearing was absent. Despite being on notice of this deficiency, the appellant did not ask to submit the sentencing hearing transcript as a supplement to the record. The trial court based its sentencing consideration largely on the proof adduced at the August 2008 sentencing hearing; therefore, the record is inadequate for our review on this issue. Because the appellant failed to carry his burden of ensuring that the record is adequate, we will presume the trial court's rulings were correct. See Tenn. R. App. P. 24(b); see also Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, we will not grant the appellant relief on this issue.

D. Cumulative Errors

Finally, the appellant contends that the cumulative effect of the errors in this case warrants a reversal of his convictions. Given the state of the record, we can find no merit to this claim.

### III.  Conclusion

In sum, we conclude that the trial court did not err in admitting the victim's medical report, the State adduced sufficient proof of venue to sustain the appellant's convictions, and the appellate record was insufficient to demonstrate that the trial court erred in sentencing the appellant.  Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE